AMERICAN CONCRETE INSTITUTE *v.* STATE TAX
COMMISSION.

OPINION OF THE COURT.

1. TAXATION—REAL PROPERTY—EXEMPTION—EDUCATIONAL OR SCIENTIFIC INSTITUTION.

Real property of an educational or scientific institution incorporated under the laws of this State while occupied by it solely for the purposes for which it was incorporated is exempt from taxation (CL 1948, § 211.7).

2. SAME—SCIENTIFIC INSTITUTION—ACTIVITIES.

Activity of an institute devoted to a particular area of technology in gathering the results of research papers of others principally members of the institute, evaluating them, and publishing them *held,* not to be scientific activity within meaning of taxation statute (CL 1948, § 211.7, as amended by PA 1963, No 148).

3. SAME—REAL PROPERTY—EXEMPTION—EDUCATIONAL OR SCIENTIFIC INSTITUTION.

Real property, to qualify for exemption from property taxes for educational or scientific institution, must be owned and occupied by the exemption claimant, the claimant must be a library, benevolent, charitable, educational or scientific institution and must be incorporated under the laws of the State and the property must be used by the claimant solely for the purposes for which the claimant was incorporated.

4. SAME—PROPERTY—EXEMPTION—EFFECT OF EXEMPTION FROM FEDERAL TAXES.

Claimant's exemption from Michigan *ad valorem* taxation is not determinable by its exemption as an educational or scientific institution from payment of Federal income taxes but by the stricter provisions of the Michigan general property tax act.

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 11–14] 51 Am Jur, Taxation § 619 *et seq.*
[2, 5, 8, 9] 51 Am Jur, Taxation § 620.
[3] 51 Am Jur, Taxation § 621.
[6, 7] 51 Am Jur, Taxation § 524.
[10] 5 Am Jur 2d, Appeal and Error § 1009.

5. SAME — PROPERTY — EXEMPTION — SCIENTIFIC INSTITUTION — PUBLISHING OF SCIENTIFIC DATA.

The compilation, editing, handling and publishing of scientific data are not sciences within the accepted meaning of that term for purposes of qualifying an organization for property tax exemption as a scientific institution.

6. SAME—PROPERTY—EXEMPTIONS NOT TO BE INFERRED.

An exemption from a State's taxing power will never be inferred from language in a taxing statute which will admit of any other reasonable construction.

7. SAME—PROPERTY—STATUTES—CONSTRUCTION.

Tax exemption statutes must be strictly construed against the claimant of the exemption.

8. SAME — SCIENTIFIC INSTITUTION — EXEMPTION — WORDS AND PHRASES.

"Scientific institution", within the intendment of statute granting tax exemption to scientific institutions, means an institution which performs a direct service for the general public, not for a professional organization of private persons (CL 1948, § 211.7, as amended by PA 1963, No 148, and § 211.9, as amended by PA 1964, No 275).

9. SAME—PROPERTY—EXEMPTION.

Claimant concrete institute did not qualify for property tax exemption for scientific institutions where activities benefited a professional organization of private persons rather than the general public and where its activities, which did not include research or experimentation, consisted of the gathering and publishing of scientific data for which, in its publications, it disavowed all responsibility as an institution and where its facilities were used for many purposes which were not solely scientific.

10. COSTS—TAXATION—EXEMPTION—PUBLIC QUESTION.

No costs are allowed on appeal from State tax commission determination that claimant's property is not entitled to exemption from property taxes, a public question being involved.

CONCURRING OPINION.
LEVIN, J.

11. TAXATION—PROPERTY—SCIENTIFIC INSTITUTION—EXEMPTION.

*The facts that organization seeking tax exemption as a scientific institution carries on no research on its premises and that it is*

*supported by contributions from its members do not alone disqualify it from such exemption under tax statute (CL 1948, § 211.7, as amended by PA 1963, No 148; CL 1948, § 211.9, as amended by PA 1964, No 275).*

12. SAME—PROPERTY—EXEMPTION—PUBLIC INTEREST.

*Something more than serving the public interest is required to bring one claiming a tax exemption as an educational or scientific institution within the goals and policies sought to be implemented by tax statutes (CL 1948, § 211.7, as amended by PA 1963, No 148; CL 1948, § 211.9, as amended by PA 1964, No 275).*

13. SAME—PROPERTY—EXEMPTION—RELIEF OF BURDEN OF GOVERN-MENT.

*Tax exemption allowed for property of educational or scientific institutions may be availed of by an institution, otherwise within statutory definition, which makes a substantial contribution to the relief of the burden of government.*

14. SAME—PROPERTY—EXEMPTION.

*Claimant American Concrete Institute is not entitled to property tax exemption where it has not been shown that its current publications constitute projects which, in the claimant's absence, would have to be undertaken by public agencies, and where its compilation of building code requirements, although possibly of use to governmental agencies, has not been subject to such revision or review in recent years as to constitute it a current contribution toward the relief of the burden of government.*

Appeal from State Tax Commission. Submitted Division 1 February 10, 1967, at Detroit. (Docket No. 2,047.) Decided July 31, 1968. Leave to appeal denied October 10, 1968. See 381 Mich 782.

The Michigan State Tax Commission determined that certain real and personal property of American Concrete Institute was not exempt from taxation by the city of Detroit. American Concrete Institute appeals. Affirmed.

*Fischer, Sprague, Franklin & Ford (Justin C. Weaver,* of counsel), for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *T. Carl Holbrook* and *Richard Roesch,* Assistant Attorneys General, for defendant.

McGregor, J.  Plaintiff-appellant American Concrete Institute is a Michigan nonprofit corporation which owns, occupies and uses real and personal property in the city of Detroit.  In January, 1965, the Institute protested to the Detroit board of assessors that its property owned on December 31, 1964, should be exempt from taxation under sections 7 and 9 of the Michigan general property tax act,[1] for the reason that the owner was an educational and scientific institution.  The assessors declined to exempt the property and the Institute appealed to the Detroit common council, sitting as a board of review.  Upon being denied the exemption by the board of review, the Institute appealed to the Michigan State tax commission.  The tax commission took testimony on September 9, 1965, and on March 17, 1966, entered an order finding that the American Concrete Institute was not a scientific or educational institution, as follows:

"* * * that the American Concrete Institute is not predominantly an educational or scientific institution and that it must share the common burdens of taxation imposed upon many altruistic and philanthropic persons, natural and legal."

_____

[1] Michigan general property tax law, CL 1948, § 211.7, as amended by PA 1963, No 148, and § 211.9, as amended by PA 1964, No 275 (Stat Ann 1965 Cum Supp §§ 7.7, 7.9).

Upon application, this Court granted leave to appeal.

Should the real estate and personal property of the American Concrete Institute, situated in the city of Detroit, be exempt from property taxes, in accordance with sections 7 and 9 of the Michigan general property tax act, which exempts the property of educational and scientific institutions from taxation? The parties apparently agree that the Institute is not an educational institution and that the word "scientific" is the word which needs judicial interpretation.

Sections 7 and 9 of the Michigan general property tax act, *supra,* provide as follows:

"Sec. 7. The following property shall be exempt from taxation: * * *

"Fourth, Such real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions * * * incorporated under the law of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated. * * *

"Sec. 9. The following personal property shall be exempt from taxation, to wit:

"First, The personal property of benevolent, charitable, educational and scientific institutions, incorporated under the laws of this state:"

The task of this Court is to determine whether or not the American Concrete Institute is legally a scientific institution.

By a ruling letter dated February 3, 1956, the United States Treasury Department held that the American Concrete Institute was exempt from Federal income tax under the provisions of section 501(c)(3) of the internal revenue code of 1954 [26 USCA § 501(c)(3)], as being "organized and oper-

ated exclusively for educational and scientific purposes." Section 501(c)(3) of the internal revenue code exempts from income tax "corporations　*　*　* organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or educational purposes." The word "scientific" is not defined in the internal revenue code, but regulations by the United States treasury department provide as follows:

"(5) Scientific defined.

"(i) Since an organization may meet the requirements of Section 501(c)(3) only if it serves a public rather than a private interest, a 'scientific' organization must be organized and operated in the public interest　*　*　* Therefore, the term 'scientific' as used in Section 501(c)(3) includes the carrying on of scientific research in the public interest." Federal Tax Regulations, § 1.501(c)(3)–1(5)(i).

The position of the defendants is that the Institute is not scientific because (1) the Institute has no laboratory, and (2) the Institute serves primarily the business interests of its members rather than the welfare of the general public.

The American Concrete Institute, in its attempt to prove that it is a scientific institution, offered the testimony of two witnesses at the hearing before the State tax commission, and introduced 20 exhibits in evidence. The witnesses were Mr. William A. Maples, the executive director of the American Concrete Institute, and Professor Elihu Geer of the College of Engineering at the University of Detroit. Professor Geer is a member of the Institute and uses its publications in teaching his courses at the University.

Plaintiff introduced into evidence the articles of incorporation of the American Concrete Institute, which state the purposes of the Institute as follows:

"To further engineering education and scientific investigation and scientific research by organizing the efforts of its members for a nonprofit, public service in gathering, correlating and disseminating information for the improvement of the design, construction, manufacture, use and maintenance of concrete products and structures.

"It is the intention and purpose of the members of this corporation that the corporation shall be and remain exempt from all forms of taxation and that contributions to the corporation shall at all times be deductible by the contributor for purposes of federal income tax. The powers of the members and the directors are therefore restricted to those powers compatible with the accomplishment of the above purposes. This corporation is accordingly organized and shall be operated exclusively for educational and scientific purposes. * * *"

The executive director of the Institute since 1953 testified that:

"[He] supervises the work of the staff of employees and is responsible for the organizational meetings, publication of the monthly journal, the special publications, the organization of conventions, and meetings and coordination of the work of technical committees. * * *

"We have a technical director who is a licensed structural engineer * * * We have an editorial department consisting of four individuals under a managing editor who is responsible for the production of publications of which the principal one is the journal. * * *

"The real work of the institute is involved with the technical committees of which there are approximately 70 * * * The committees aim toward supplying scientific information for the use of the building code committee. * * *

" * * * The 'Journal of the American Concrete Institute' * * * is the official publication of the society * * *. Each issue contains tech-

nical papers related to research in concrete, design practice and construction practices. * * * This publication goes to each of our 13,000 members and approximately 1,000 subscribers which are principally libraries. * * *

"The function of the Research Committee is to report on research in progress. * * *"

The Institute introduced into evidence exhibits of a manual on concrete inspection, a manual on reinforcing concrete structures and other institute publications. One of these exhibits, "Lessons from Failures of Concrete Structures," includes the following:

" 'This monograph is published in furtherance of ACI objectives in the fields of engineering education and technology. The Institute is not responsible, as a body, for the statements and opinions advanced in this publication; Institute authority attaches only to standards adopted as provided in the ACI By-Laws.' "

Plaintiff contends that, basically, the operations in the headquarters office of the Institute are to put into effect the policies adopted by its board of directors, which are in carrying out the basic charter of the Institute in the gathering, correlation, and dissemination of scientific information. All of the interchange of correspondence and reports are channeled through these headquarters. There is a research committee which has an executive group of individuals who establish the policy of the committee; the function of this committee is to report on research in progress.

Professor Elihu Geer, of the Department of Civil Engineering at the University of Detroit, teaches mainly structural courses such as The Theory of Structures I and II, and Reinforced Concrete Struc-

tural Design. He testified as to his use of books published by the American Concrete Institute:

"When I teach reinforced concrete or prestressed concrete I have in my hand, and the students have in hand, what has been referred to as the Code";

and further that:

"* * * science, in a few words, is organized knowledge; it is knowledge which has been discovered, accumulated or gathered, evaluated and codified or systematized and published for the guidance of other people * * *. [A scientific institution] is one that develops this science, performs these operations in general * * *.

*Q.* "Is the work of the ACI that you have seen and participated in scientific in nature?
*A.* "Yes. * * *

"[Exhibit 15,] 'Ultimate Strength Design of Reinforced Concrete Columns' * * * is highly scientific in nature; * * *

*Q.* "Is it your opinion that the organization that produced that exhibit was a scientific organization?
*A.* "Yes."

The entire record clearly demonstrates that the Institute gathers the results of research papers of others, principally members, evaluates them and subsequently publishes them and such handling and publishing of scientific materials is not itself scientific.

The State tax commission order stated as follows:

"The Detroit headquarters of the American Concrete Institute does not engage in experimentation. It assembles and evaluates studies relating to qualities of concrete products which are transmitted to the Detroit headquarters by its membership and by engineering schools of various universities. In a sense the Detroit property is headquarters for the membership and compiling information on concrete,

a center for specialized information, a covenient meeting place for its membership, and people generally interested in the study of concrete."

There is a clear statement of the four elements required to be proven by a claimant for exemption of real property set forth in the case of *Engineering Society of Detroit* v. *City of Detroit* (1944), 308 Mich 539, 550:

"(1) The real estate must be owned and occupied by the exemption claimant;

"(2) The exemption claimant must be a library, benevolent, charitable, educational or scientific institution;

"(3) The claimant must have been incorporated under the laws of this State;

"(4) The exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated."

The applicable statute then,[2] as now, provided that:

"The following * * * property shall be exempt from taxation: * * *

"Fourth, Such real estate as shall be owned by library, benevolent, charitable, educational or scientific institutions * * * incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated."

Plaintiff has substantially established three of the four prerequisites for exemptions of its real property as required by that case. The Institute has shown that (1) it owns the real property in question; (2) it is incorporated under the laws of this State; and (3) it occupies the real estate for the purposes for which it was incorporated and, in addition thereto, many other nonscientific purposes.

---

[2] CL 1929, § 3395, as amended by PA 1941, No 125.

The record further shows that the Institute uses its headquarters in the city of Detroit as a center from which it organizes the efforts of its membership, and as a gathering and publication office for information useful in the art of concrete design, construction and manufacture. Its building is a national headquarters, and is used for many purposes which are not solely scientific, as contemplated by the language contained in the statutes. The Institute is incorporated to organize the efforts of its membership and arrange these efforts into a movement supporting engineering education and scientific investigation and research.

The amount of alleged scientific work done by the Institute in or on the premises actually is small in proportion to the volume and variety of other activities conducted there.

At its headquarters, the Institute employs 26 persons. Four of them constitute an "editorial department", responsible for the production of publications, the principal one of which is the Journal of the Institute. Five employees are assigned to the "membership department," charged mainly with keeping records concerning the 13,000 institute members. Six members constitute the "stenographic pool", one employee is the "technical librarian," and another is a janitor. These employees perform their work under the supervision of the executive director of the Institute, the assistant secretary, and a "technical director" who coordinates the work of the "technical committees," which work is conducted elsewhere. The record shows that the American Concrete Institute does not conduct any research whatever upon the property for which it claims exemption.

The Institute's income tax status does not affect or predetermine the taxable status of its property under the Michigan general property tax law, as it

contends. The Institute's exemption from Michigan
*ad valorem* tax is not determinable by its qualifica-
tion as an organization exempt from income tax un-
der section 501(c)(3) of the internal revenue code of
1954, but by the much more strict provisions of the
Michigan general property tax act, *supra,* sections
7 and 9. A reading of the language of these two
provisions (Federal and State) clearly demonstrates
the difference. The Institute's services are princi-
pally for its members, which eventually will benefit
the public, but are not the kind of services to the
general public which were contemplated by the legis-
lative enactment for tax exemption.

The design, construction and manufacture of con-
crete products and structures are useful arts. The
compilation, editing, handling and publishing of
scientific data by the Institute are not sciences with-
in the generally accepted meaning of that term. The
Institute has, for its purposes, the "gathering, cor-
relating and disseminating [of] information for the
improvement of the design, construction, manufac-
ture, use and maintenance of concrete structures and
products."

The rule is well stated in 2 Cooley on Taxation (4th
Ed), § 672, pp 1403–1408:

"An intention on the part of the legislature to
grant an exemption from the taxing power of the
State will never be implied from language which
will admit of any other reasonable construction.
Such an intention must be expressed in clear and
unmistakable terms, or must appear by necessary
implication from the language used, for it is a well-
settled principle that, when a specific privilege or
exemption is claimed under a statute, charter or act
of incorporation, it is to be construed strictly against
the property owner and in favor of the public. This
principle applies with peculiar force to a claim of
exemption from taxation. Exemptions are never

presumed, the burden is on a claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed and cannot be made out by inference or implication but must be beyond reasonable doubt.  In other words, since taxation is the rule, and exemption the exception, the intention to make an exemption ought to be expressed in clear and unambiguous terms; it cannot be taken to have been intended when the language of the statute on which it depends is doubtful or uncertain; and the burden of establishing it is upon him who claims it.  Moreover, if an exemption is found to exist, it must not be enlarged by construction, since the reasonable presumption is that the State has granted in express terms all it intended to grant at all, and that unless the privilege is limited to the very terms of the statute the favor would be extended beyond what was meant."

Exemption statutes must be strictly construed against the exemption claimant.

"Taxation, like rain, falls on all alike.  True, there are, in any taxing act, certain exceptions, certain favored classes, who escape the yoke.  But one claiming the unique and favored position must establish his right thereto beyond doubt or cavil."  *In re Smith Estate* (1955), 343 Mich 291, 297 (51 ALR2d 847).  Also see *City of Detroit* v. *Detroit Commercial College* (1948), 322 Mich 142.

The conclusion is inescapable that within the intendment of sections 7 and 9 of the general property tax law, *supra,* a "scientific institution" is one which performs a direct service—not to a professional organization of private persons, but to the general public.  The Institute in its use of the property, is not acting solely for the purposes for which it was incorporated as a scientific institution, but largely for disseminating information concerning concrete. This is supported in part by an admission in several

of its publications that it did not vouch for matters published therein.

"It is not enough, in order to exempt such associations from taxation, that one of the direct or indirect purposes or results is benevolence, charity, education, or the promotion of science. They must be organized chiefly, if not solely, for one or more of these objects." *Attorney General* v. *Common Council of Detroit* (1897), 113 Mich 388, 390.

Committees operating under the direction of plaintiff do not have laboratory equipment, nor do they conduct experiments. No such experiments are carried on in plaintiff's premises. It is quite apparent that the property in question is substantially used for many purposes which are not solely scientific in nature. Many of the cases cited from other jurisdictions reveal statutory dissimilarities and their worth as precedent herein is dubious. From a careful inspection of all the exhibits and a reading of the record, it is inescapable that, in order to grant exemption to plaintiff, the meaning of the word "scientific" must be enlarged from its commonly understood and accepted definition. Likewise, the use of its property must be *principally* for purposes that are contemplated by the language of the statute, *i.e.,* "while occupied by them solely for the purposes [scientific investigation and scientific research] for which they were incorporated." It, therefore, follows that the plaintiff is not entitled to tax exemption.

The order of the State tax commission is affirmed. No costs, a public question being involved.

BURNS, J., concurred with McGREGOR, J.

LEVIN, J., (*concurring*). I concur in the result reached by my brothers, but for somewhat different reasons.

Merely because the American Concrete Institute is largely supported by contributions from its members does not disentitle it to a tax exemption to which it otherwise would be entitled.[1]

Nor do I think it consequential that no research is done on the premises owned by the Institute. An organization which, like the American Concrete Institute, causes research to be undertaken by others and which collates, evaluates and disseminates the results of that research and other useful knowledge which it collects and organizes is, literally speaking, a scientific institution.[2]

The Institute's publications are widely used by architects, engineers and others interested in this field of endeavor. One of its publications, Building Code Requirements for Reinforced Concrete, is the basis of governmental regulation of concrete construction in a large number of communities. The Institute is not a trade association. Its research and publication programs are not oriented toward business promotion or profit making, although they, no doubt, advance the use of concrete. The work of the Institute is in the public interest. But all legitimate endeavor, including admittedly business and commercial pursuit, is in the public interest.

Something more than serving the public interest is required to bring one claiming exemption as an educational or scientific institution within the "goals and policies sought to be implemented by CL 1948, § 211.7, as amended by PA 1963, No 148, (Stat Ann 1965 Cum Supp § 7.7), CL 1948, § 211.9, as amended by PA 1964, No 275, (Stat Ann 1965 Cum Supp

---

[1] 2 Cooley, Taxation (4th ed), § 739, pp 1545, 1546; 51 Am Jur, Taxation, § 602, p 585.

[2] "A 'scientific institution,' under the language of all civilized countries, means an institution for the advancement or promotion of knowledge, which is the English rendering of 'science'." *The Detroit Home & Day School* v. *The City of Detroit* (1889), 76 Mich 521, 523.

§ 7.9)." *David Walcott Kendall Memorial School* v. *The City of Grand Rapids* (1968), 11 Mich App 231. In the cited case our Court declared that the general exemption under consideration may be availed of by an institution otherwise within its definition which makes a substantial contribution to the relief of the burden of government.[3] Although the Court was then speaking of a claim of exemption as an educational institution, on principle its holding has equal application to the claim at hand.[4]

The question is one of degree. Each case will turn on its own facts and circumstances. As we move beyond the traditional charitable objectives, those of providing relief to persons unable to care for themselves, education and religion, we scrutinize more carefully claims of exemption.

In this case the State tax commission found that the American Concrete Institute had not established that its contribution to the relief of the burden of government was sufficiently substantial to warrant the claimed exemption. That conclusion is justified by the record and comports with the construction of the statute given by our Court in *David*

---

[3] No doubt it will not be necessary to establish that the work being done by the organization claiming charitable exemption actually has been undertaken by a particular unit of government or taxing body within whose boundaries the organization claiming exemption is located. In *District of Columbia* v. *National Wildlife Federation* (CA DC, 1954), 214 F2d 217, 219, the court declared that an institution claiming exemption as a scientific institution was not required to show that it performs a service of substantial character which otherwise the local government, or any other, would actually assume, but that when an exemption is claimed on that ground the court examines the institution's "objects and activities in light of the purpose of the legislature to aid and encourage by tax exemption enterprises performing a public or quasi-public service."

[4] The relief of the burden of government test stated in the *Kendall School* case applies where the organization seeks exemption, as does the American Concrete Institute, as an educational or scientific institution. The principle stated in *Kendall School* harmonizes preceding Michigan Supreme Court cases discussing the scope of the exemption for educational and scientific institutions. The *Kendall School* principle need not, however, be applied where the organization seeks exemption under our statute as a charitable institution.

*Walcott Kendall Memorial School* v. *The City of Grand Rapids, supra.*

The Institute's technical publications are, no doubt, enlightening to those interested in the latest in concrete technology, but it has not been shown that they, any more than countless like publications in countless other fields, represent a significant contribution to the relief of the burden of government. The Institute's Building Code Requirements for Reinforced Concrete adopted in 1963 may well have relieved government or some government of the burden of producing standards needed to make possible meaningful governmental regulation of the use of concrete in construction, but that important work was completed before the current tax years; it has not been shown that any continuing review and revision of the code by the Institute since 1963[5] represents a significant contribution to the relief of the burden of government in current tax years.[6] The work done in 1963 and prior years on the code does not entitle the Institute to an on-going exemption *in futuro.*

---

[5] It appears that other particularized standards have been adopted by the Institute in various years between 1944 and 1965. The record does not show whether any of these are used by any government in its regulatory program, nor does the record show whether there has been any revision since 1963 of the Building Code Requirements for Reinforced Concrete.

[6] Compare *Dulles* v. *Johnson* (CA 2, 1959), 273 F2d 362 (80 ALR2d 1338), *certiorari denied* (1960), 364 US 834 (81 S Ct 54, 5 L Ed 2d 60), and *American Society for Testing and Materials* v. *Board of Revision of Taxes* (1967), 423 Pa 530 (225 A2d 557), where the record showed that the organizations which there succeeded in obtaining exemption made a continuing contribution, including during the tax years before the court, in fields of endeavor where, but for that contribution, government would have had to step in and do the job that was being done by the organization in question. Contrast *Massachusetts Medical Society* v. *Assessors of Boston* (1960), 340 Mass 327 (164 NE2d 325).