# NORTH STAR RESEARCH INSTITUTE v. COUNTY OF HENNEPIN.

236 N.W. 2d 754.

October 17, 1975—No. 45102.

*Gary W. Flakne,* County Attorney, and *David E. Culbert* and *Paul R. Jennings,* Assistant County Attorneys, for appellant.

*Hayner N. Larson, Hubert V. Forcier,* and *Faegre & Benson,* for respondent.

2

SHERAN, CHIEF JUSTICE.

Appeal from a judgment of the Hennepin County District Court holding that respondent North Star Research Institute is exempt from personal property taxes assessed in 1968, 1969, and 1970. The trial court determined that during these years respondent was operating as a nonprofit corporation for charitable purposes within the meaning of former Minn. Const. art. 9, § 1, now Minn. Const. art. 10, § 1[1] and Minn. St. 272.02, subd. 1(6).[2] We reverse.

---

[1] The applicable constitutional provision is former art. 9, § 1. Prior to its November 3, 1970, amendment, it read, in pertinent part: "* * * Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes, but public burying grounds, public school houses, public hospitals, academies, colleges, universities, and all seminaries of learning, all churches, church property and houses of worship, institutions of purely public charity, and public property used exclusively for any public purpose, shall be exempt from taxation * * *." The 1970 amendment added these words after "taxation": "except as provided in this section." Then, at the end of § 1, these words were also added: "The legislature may by law define or limit the property exempt under this section, other than churches, houses of worship, and property solely used for educational purposes by academies, colleges, universities and seminaries of learning." The Minnesota Constitution was amended in the November 1974 general election, and the former art. 9, § 1, became art. 10, § 1. These grammatical changes were also made: "* * * Taxes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes, but public burying grounds, public school houses, public hospitals, academies, colleges, universities, all seminaries of learning, all churches, church property, houses of worship, institutions of purely public charity, and public property used exclusively for any public purpose, shall be exempt from taxation except as provided in this section. * * * The legislature by law may define or limit the property exempt under this section other than churches, houses of worship, and property solely used for educational purposes by academies, colleges, universities and seminaries of learning."

[2] Minn. St. 272.02, subd. 1, provides in part: "Except as provided in

The significant facts stipulated by the parties can be found in State v. North Star Research & Development Institute, 294 Minn. 56, 200 N. W. 2d 410 (1972). Since the decision in that case, North Star Research and Development Institute has been renamed North Star Research Institute. The title of this case is amended to reflect the change, and the corporation will be called "North Star" in this opinion.

North Star has failed to sustain its burden of proving entitlement to exemption.[3] In summary, we hold:

(1)   To be exempt from taxation, property must be put to a use which is purely charitable and public;

(2)   A significant part of the use to which the property of North Star is put involves applied research for private business enterprises engaged in business for profit;

(3)   Any private business contracting with North Star to conduct research acquires an exclusive proprietary interest in the information developed, which it can use to its advantage in the market place and which, if it sees fit, it can preclude others from using by obtaining patents;

(4)   The fact that a substantial part of the research is done for governmental agencies, Federal and state, does not make North Star "purely" charitable and public;

(5)   If the research done for private enterprise is so minimal in comparison to the total as to be of no legal consequence, the record fails to demonstrate it.

North Star was organized in 1963 in response to a recognized need for a center in this area capable of providing applied re-

---

other subdivisions of this section, all property described in this section to the extent herein limited shall be exempt from taxaton:

\* \* \* \* \*

"(6)   Institutions of purely public charity."

[3] In re Junior Achievement of Greater Minneapolis, Inc. v. State, 271 Minn. 385, 135 N. W. 2d 881 (1965).

search services. It has functioned as a nonprofit corporation, although its capital resources came principally from the Minneapolis Area Development Corporation (a business corporation which was dissolved when its assets, valued in excess of $3,000,000 and consisting mainly of approximately 2,100 acres of real estate in Scott County, were transferred to North Star) and from other persons, including corporations, who had formed MADC. As a result of these contributions, plus an additional $800,000 given by other individuals and corporations, North Star received donated capital in excess of $4,300,000. All but a small part of the real estate has been or is being developed and marketed commercially. The "members" of North Star, comparable in position to the shareholders in a business corporation, are 12 persons of distinction, none of whom are paid directly or indirectly for their efforts. The "directors" of North Star, selected by the members, are educators, professional persons, representatives of the business community, and other community leaders, who serve without compensation and receive no special benefit from North Star.

The applied research produced by North Star, measured in dollars, has reached an annual level exceeding $1,000,000. Of this amount, more than half has been performed at the request of Federal and state governmental agencies, but in number the clients served are mostly private corporations. North Star's clients define the objective for the applied research to be carried out pursuant to agreement and pay a fee for the services, fixed usually at cost plus 8 percent. Of determinative significance, the research work product becomes the property of the client requesting it—an interest which may be, and in some instances has been, protected by patent application. Examples of research projects conducted at the request of business concerns by North Star include: The discovery of commercial uses for waste products; the discovery of devices to control rodents in grain storage facilities; the analysis and refinement of billing and accounting procedures; the use of ultrasound to improve the quality of sugar

beet seeds; the development of a device to improve the function of a filtering system.

Given these facts, the issue becomes: Is a nonprofit corporation engaged in applied research which to a significant degree makes its services available to private enterprises, who pay for the research defined and requested by them on a cost-plus basis and acquire ownership of the information developed as a result of the undertaking, entitled to tax-exemption status under the provisions of Minnesota's Constitution and statutes?

We accept for purposes of analysis these propositions:

(1) The research facility could not function without the initial donations of capital made by persons who are concerned with the economic development of the area and who receive no significant special benefit because of the existence of the facility.

(2) For the most part, the research center realizes no profit; any profits which are generated are used to improve the research potential of North Star.

(3) The individuals who manage and control North Star do so without pecuniary reward and are motivated primarily by an interest in improving the economic climate and general well-being of the area which North Star serves.

Our decisions give us no controlling precedent or direction by clear analogy. In State v. North Star Research & Development Institute, 294 Minn. 56, 200 N. W. 2d 410 (1972), the majority of the court limited their decision to a holding that North Star was a nonprofit corporation and therefore entitled to a tax exemption available to nonprofit corporations leasing real estate owned by public schools for limited periods of time. It is clear that the dissenters rejected the theory that North Star was a "purely public charity," but the majority reserved judgment on the question and it remains open for decision.

For the most part, the decisions of this court have dealt with organizations which were engaged in charitable undertakings in the traditional sense—care for the sick, the aged, and the in-

firm;[4] education of young people;[5] hospital care for the poor;[6] facilities to promote the moral and educational welfare of youth;[7] institutions for religious education.[8] In these cases, assessment has been made of such factors as (1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users produces a profit to the charitable institution; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

The tendency of our decisions has been to sustain exemption where these traditionally "charitable" objectives are being furthered, so long as no individual profits from ownership of the "charity" are realized and so long as the undertaking is not a subterfuge by which the needs of a select and favored few are accommodated.[9]

These undertakings have one characteristic in common which

---

[4] In re Claim of Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197, 140 N. W. 2d 336 (1966).

[5] In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W. 2d 881 (1965).

[6] See, County of Hennepin v. Brotherhood of Church of Gethsemane, 27 Minn. 460, 8 N. W. 595 (1881).

[7] Christian Business Men's Committee of Minneapolis v. State, 228 Minn. 549, 38 N. W. 2d 803 (1949).

[8] County of Hennepin v. Grace, 27 Minn. 503, 8 N. W. 761 (1881).

[9] In this context, the word "purely" means "wholly," "solely," and "exclusively." State v. Willmar Hospital, Inc. 212 Minn. 38, 41, 2 N. W. 2d 564, 566 (1942).

serves to distinguish them from the case at hand: In none can it be said that a person or corporation gains a profit or commercial advantage as the immediate and intended direct consequence of the "charity."

In all of these situations except those involving religious education, where constitutional limitations apply, the activity involved is one which our state and Federal governments have historically supported with public funds. Government programs for relief of poverty, care for the sick and aged, and the education and training of young people have been long and widely accepted. It can be said with respect to activities that are traditionally "charitable" that ultimately people will benefit in an economic sense from the charitable undertaking. Persons relieved from poverty and illness and the restraints of old age demand less of, and contribute more to, the economic well-being of a community than do those who are not so relieved. A person who receives the benefits of an education, whether theoretical or practical, may add more to the well-being of a society than one who is not so advantaged. It has been recognized that religious education and training add to the moral strength of a community.

There are distinctive characteristics of North Star which make its situation so different from those of charities in the traditional sense that reference to general statements made in our previous cases are of limited value.

For one thing, the objective of North Star is to put the benefits of research to the purposes of commerce. North Star succeeds in its goal only if through its research facilities commercial enterprises secure information which can be put immediately and directly to profitable use. Its concern is not to develop knowledge in the abstract, with possible indirect benefit to private enterprise, but instead to apply research tools to the particular problems of a particular business enterprise for the specific purpose of developing data or processes which can be turned into a profit for the beneficiary of the information. It is true of course that a public advantage is achieved ultimately whenever

a process is discovered which makes it possible to produce goods or services more efficiently and economically than would otherwise be the case. But this public benefit is an indirect one and is not the immediate objective of the undertaking.

A second characteristic of North Star, and the critical one, is that information developed as a result of the research is not made available to the public generally or to industry generally. Instead, the knowledge becomes the exclusive property of the profit-making enterprise for which it was researched. It is appropriate, and probably necessary, that this exclusive entitlement to the product of the research be granted to the business organization which requested and, in part at least, paid for it. But a process which enables one business to improve its competitive position with respect to others in the same field cannot be said to be a "charity" as that term has been generally understood, even in its broadest sense. And the purpose of improving directly the profit-making potential of a private business is not a "public purpose" in a sense comparable to such purposes as the relief of poverty and sickness, the general dissemination of knowledge, and the encouragement of religion, science, and the arts. "Charity" in the strict sense and applied research, whether motivated directly and immediately by humanitarian considerations or considerations of profit, are both important to the social welfare. The difference lies in the fact that applied research immediately and directly related to profit-making activities is better able than purely charitable activities to share the burdens of taxation.

The question remains whether principles enunciated by this court and others permit a determination that an entity dealing with nonprofit activities for a purpose essentially economic constitutes a purely public charity notwithstanding the significant differences delineated. We address ourselves, then, to illustrative cases bearing on the question.

Minnesota cases involving issues similar to the present one are: State v. Evans Scholars Foundation, 278 Minn. 74, 153

N. W. 2d 148 (1967) ; In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W. 2d 881 (1965) ; Camping & Education Foundation v. State, 282 Minn. 245, 164 N. W. 2d 369 (1969) ; Madonna Towers v. Commr. of Taxation, 283 Minn. 111, 167 N. W. 2d 712 (1969) ; and State v. United Church Homes, Inc. 292 Minn. 323, 195 N. W. 2d 411 (1972).

In the Evans Scholars Foundation case, exemption was denied because the educational scholarship program involved was conditioned upon the recipient's past employment as a caddy at a limited number of golf courses. We said (278 Minn. 79, 153 N. W. 2d 151) : "It is a restriction which, in our opinion, serves a private rather than a public objective," and upon that ground exemption was denied.

In the Junior Achievement case, we had for consideration an educational program—traditionally favored—and exemption was allowed even though the study program involved training in practical business affairs for young people. We emphasized that the program was available to all persons between the ages of 15 and 19, and that no profit motive was involved in its operation.

In the Camping and Education Foundation case, exemption was denied to a nonprofit corporation operating a boys' camp in northern Minnesota. The court recognized that recreational facilities for young people serve a commendable purpose but, noting that the bulk of the camp's income came from tuition charges made to campers, rejected the exemption.

In the Madonna Towers and the United Church Homes cases, exemption was denied to homes for the aged, also a traditionally favored form of charitable activity, because the charges made to residents by the nonprofit corporations involved gave a preferred status to wealthy persons.

While it can be said that each of these cases deals with a situation where economic and charitable motivations were intertwined, none of them bears directly on the problem presented by the unique facts of this case.

Of the cases from other jurisdictions which have been called to our attention, the one most directly in point is Battelle Memorial Institute v. Dunn, 148 Ohio St. 53, 73 N. E. 2d 88 (1947), where the Supreme Court of Ohio held that realty was not used exclusively for "charitable" purposes when it was used for extensive research for compensation for industrial corporations and others and when *the results of the research were primarily for the pecuniary advantage of those for whom the research was performed.* The stated purpose of the Battelle Institute was "the encouragement of creative and research work and the making of discoveries and inventions in connection with the metallurgy of coal, iron, steel, zinc and their allied industries * * *." 148 Ohio St. 55, 73 N. E. 2d 90. Capital funds for the project came principally from bequests. A principal source of the institute's income was endowments, the balance coming from payments made by industrial concerns and governmental agencies for "sponsored research." The charges made for this research were on a cost-plus basis. The Ohio court noted (148 Ohio St. 58, 73 N. E. 2d 91):

"The institute, in conducting this 'sponsored research,' often makes discoveries for the sponsors which are valuable and patentable. Generally, the sponsors procure patents and reap whatever resulting benefits there may be."

The institute was a nonprofit corporation, but receipts from sponsored research approximated and sometimes exceeded, costs of operation.

The work of the Battelle Institute was not confined to "sponsored reasearch"; technical reports and scientific treatises were distributed generally to individuals and institutions having an interest in the subject matter. Nevertheless, the court concluded (148 Ohio St. 60, 73 N. E. 2d 92):

"There can be little doubt that the institute's real property, which it seeks to have exempted from taxation, is being devoted *in part* to activities which may properly be denoted as 'chari-

table.' Generally, the dissemination of knowledge for the edification and improvement of mankind is regarded as a charitable object. However, under the will of Gordon Battelle, providing for the institute, he plainly stated that it should be conducted in furtherance of the interests and to serve the ends of designated industries, which certainly would not constitute a charitable purpose. In practice, the institute is being operated in large measure as a business for the benefit and financial advantage of commercial enterprises. *The 'sponsored research' is financed by these commercial enterprises and they are the direct beneficiaries of what is produced by the institute for them. Therefore, the real property in issue cannot fairly be said to be used exclusively for charitable purposes within the contemplation of the statute.* * * *

\* \* \* \* \*

"*Where the use of property is wholly for the promotion and advancement of learning, science and the useful arts generally, that use is deemed charitable; but where the use is essentially for the private and pecuniary advantage of a class, such as industrial organizations, the contrary is true.*" (Italics supplied in part.)

In our judgment, the reasoning in the Battelle case applies here and controls decision.[10]

In Boston Chamber of Commerce v. Assessors of Boston, 315 Mass. 712, 54 N. E. 2d 199, 152 A. L. R. 174 (1944), it was held that a chamber of commerce, the dominant purpose of which was to promote business and trade and to foster good business practices and relations in the community with a view to increased profits as well as public benefit, was not a "charitable" institution within the meaning of a tax-exemption statute. In that deci-

---

[10] In a later case, In re Bond Hill-Roselawn Hebrew School, 151 Ohio St. 70, 76, 84 N. E. 2d 270, 273 (1949), the Ohio Supreme Court characterized the Battelle case as one of a group of Ohio decisions "involving a substantial use for a purpose having a clear commercial aspect."

sion, the court noted (315 Mass. 718, 54 N. E. 2d 202, 152 A. L. R. 179):

"Notwithstanding the law's acknowledgment of the manifold new forms in which charity may find expression, *the more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government. This statement becomes especially pertinent where the alleged charity operates in the fields of trade and commerce.* * * * A foundation for industrial research for the *sole purpose of discovering and making generally available more efficient methods of production and distribution might be a charity.* But of the multitude of trade organizations and associations existing today in all branches of industry and commerce it is believed that few could pass the test." (Italics supplied.) [11]

In American Institute for Economic Research v. Assessors of Great Barrington, 324 Mass. 509, 87 N. E. 2d 186 (1949), exemption from taxation was denied to a corporation whose purposes included conducting scientific research in economics and disseminating the results.

In Association of Bar of City of New York v. Lewisohn, 34 N. Y. 2d 143, 313 N. E. 2d 30 (1974), it was held that real property belonging to a nonprofit corporation which had as its primary purpose the promotion, exploration, and research principally in the earth's sciences was not entitled to statutory exemption from real estate taxes available to nonprofit corporations organized or conducted exclusively for charitable purposes. In denying the claimed exemption, the court said, with respect to the Explorers Club (34 N. Y. 2d 154, 313 N. E. 2d 36):

"* * * To be sure, it has charitable and educational attributes

[11] Accord, Better Business Bureau v. United States, 326 U. S. 279, 66 S. Ct. 112, 90 L. ed. 67 (1945); People ex rel. Chamber of Commerce v. Mills, 188 Misc. 593, 65 N. Y. S. 2d 231 (1946), affirmed, 272 App. Div. 804, 71 N. Y. S. 2d 896 (1947).

and functions. Indeed, the educational aspects of its current endeavors—for example, the field science lecture series—are laudatory and not insubstantial. But they are, in the final analysis, adjunctive to its primary scientific purpose—to promote exploration and research principally in the earth sciences. Similarly, the aspects of its operation properly characterizable as charitable are incidental to this overriding purpose. *That this organization confers a public benefit is not to be denied. But, again, public benefit is not the test of qualification for exemption.* And while research oriented activities may result in an educational benefit, the Explorers Club is not organized and conducted primarily for educational purposes in the traditional sense of that term." (Italics supplied.)

Institute for Trend Research v. Brown, 100 N. H. 286, 124 A. 2d 195 (1956), involved a declaratory judgment action to determine exemption from unemployment compensation contribution liability. The statutory question was whether taxpayer was a corporation (100 N. H. 290, 124 A. 2d 197) "organized and operated exclusively for * * * scientific * * * or educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual." In holding that the statute did not accord exemption, the court said (100 N. H. 290, 124 A. 2d 198):

"* * * It appears * * * that 'no substantial part of the income * * * has been used for research or other services contemplated in * * *' the exemption section of the statute, * * * and that 'less than 10 per cent of the income * * * has been used for research outside of the specific research undertaken for private business organizations.' Thus more than 90 per cent of the * * * research was paid for by and became the exclusive property of the private business organizations for whom the work was performed.

\* \* \* \* \*

"* * * [I]t may have been necessary for [taxpayer] to

operate the way it did * * * *but the small percentage of its income devoted to non-private research makes it difficult to reconcile its practice with the statutory requirement * * *.* * * The total activities* * * were directed fundamentally to private research for scientific industries rather than to basic trend research available generally to the public. Here, * * * there was a 'commercial hue permeating petitioner's organization' * * *." (Italics supplied.)[12]

American Concrete Institute v. Michigan State Tax Comm. 12 Mich. App. 595, 163 N. W. 2d 508 (1969), also involved considerations similar to the case at bar. In denying a tax exemption available to "educational and scientific institutions," the court said (12 Mich. App. 606, 163 N. W. 2d 513):

"* * * The Institute's services are principally for its members, which eventually will benefit the public, but are not the kind of services to the general public which were contemplated by the legislative enactment for tax exemption."[13]

In South Dakota State Medical Assn. v. Jones, 82 S. D. 374, 381, 146 N. W. 2d 725, 729 (1966), the South Dakota Supreme Court, in denying exemption to a medical association, wrote:

"* * * It fairly appears from the evidence that there are elements of personal advantages and profit to members of the association that differ from those inuring to the public. The activities and expenditures of the association do not sustain its claim that the property is used exclusively—that is, primarily—for a benevolent or other purpose warranting exemption."

See, also, Massachusetts Medical Soc. v. Assessors of Boston, 340 Mass. 327, 164 N. E. 2d 325 (1960).

---

[12]Accord, American Medical Assn. v. Board of Review, 392 Ill. 614, 65 N. E. 2d 350 (1946); Consumers Research v. Evans, 128 N. J. L. 95, 24 A. 2d 390 (1942), affirmed, 132 N. J. L. 431, 40 A. 2d 662 (1945).

[13] Accord, Engineering Soc. of Detroit v. City of Detroit, 308 Mich. 539, 14 N. W. 2d 79 (1944); Engineers and Scientists of Milwaukee, Inc. v. City of Milwaukee, 38 Wis. 2d 550, 157 N. W. 2d 572 (1968).

There are other decisions which have allowed tax exemption in similar situations to organizations having commercial aspects, but in each instance emphasis was placed on the circumstances that the data, information, and publicity generated by the organization claiming tax exemption were made available to the people generally, or at least such segments of the public as might have an interest in the subject matter.

In American College of Surgeons v. Korzen, 36 Ill. 2d 340, 224 N. E. 2d 7 (1967), the Illinois Supreme Court found the American College of Surgeons to be entitled to tax exemption under a statutory provision exempting realty "used for * * * charitable and beneficient purposes." 36 Ill. 2d 347, 224 N. E. 2d 10. The funds used to operate the college came primarily from donations and membership dues. The library, the education programs, and the reports of experiments and research were made available to the medical profession and the public. No one acquired a proprietary interest in the medical research developed.

People ex rel. Hellyer v. Morton, 373 Ill. 72, 25 N. E. 2d 504 (1940), involved a foundation purportedly created "for practical scientific research work in horticulture and agriculture * * * by means of a large outdoor arboretum." 373 Ill. 73, 25 N. E. 2d 505. Results of research were to be publicized to increase general knowledge. The foundation's purposes were followed. No sales were made and there was no income, other than a bulletin published at less than cost. A charitable exemption was allowed.[14]

In American Soc. for Testing and Materials v. Board of Revision of Taxes, 423 Pa. 530, 225 A. 2d 557 (1967), the nonprofit corporation's purpose, carried out by technical committees doing research and writing, was "promotion of knowledge of the materials of engineering and the standardization of specifications and methods testing." 423 Pa. 533, 225 A. 2d 558. Industry,

---

[14] Cf. Rotch v. Emerson, 105 Mass. 431 (1870), where a bequest to trustees for a sum "to be by them applied for the promotion of agricultural or horticultural improvements, or other philosophical or philanthropic purposes, at their discretion," was termed a charitable bequest.

government, and education contributed resource scientists. The claim was that the society was a mere "business pool." Achievements included a wide variety of improvements in products; better education; work for various governments; and savings to taxpayers. Members of the society included those profiting from the work. It appeared that everything done by this taxpayer was either without charge or at less than cost and that it operated at a loss. Exemption was allowed.

Of the cases from other jurisdictions we have reviewed, none appears more in point than Battelle Memorial Institute v. Dunn, 148 Ohio St. 53, 73 N. E. 2d 88 (1947), where the exemption was denied upon the ground that the results of the research were primarily for the pecuniary advantage of those for whom the research was performed. If it is possible to derive a principle from the other cases mentioned, it would be that a claim for tax exemption by an organization engaged in research in whole or in part, may be viewed sympathetically by the courts, depending on whether the entity involved makes the product of its research efforts available to the public generally. If access to the information generated by the study and research is limited in whole or in significant part to the commercial advantage of the person receiving it, and that is the case here, exemption will probably be denied, particularly in situations where the determinative language is "a purely public charity" or words of like import.

Whether exemption would be allowed if the knowledge and discoveries generated by the applied research of an organization like North Star did not become the property of a significant number of its clients remains for decision when and if a case with such facts comes before us. Our holding is limited to the proposition that the facts of this case do not justify exemption.

For the reasons stated in the special concurring opinion of Mr. Justice Kelly, the important tax exemption problem presented by this case is commended to the attention of the legislature, which has the power under our constitution to grant exemption

in cases of this kind if, in its judgment, the public interest will be advanced by doing so.

Reversed.

KELLY, JUSTICE (concurring specially).

I concur in the majority decision because the main issue here is in a gray area and our cases have favored taxation rather than exemption. As I view the issue before this court, it could be decided either way, depending upon one's personal views as to the desirability of promoting the economic development of the state at the expense, initially at least, of other taxpayers. Presumably, to the extent that the state's economic development is enhanced by North Star's presence in the area, any initial costs to other taxpayers may be more than replaced by the additional tax revenues generated by the increased economic activity. The weight that such factors should have in solving the problem at hand depends upon a variety of complex economic and political questions that could best be solved by the legislature. Indeed, that body was chosen by the people to determine the precise issue presented here.

We pointed this out in State v. North Star Research & Development Institute, 294 Minn. 56, 80, 200 N. W. 2d 410, 425 (1972) in these words:

"* * * Besides, it would be preferable to give the legislature an opportunity to limit or define the property of purely public charities that may have an exempt status, particularly in view of the fact that Minn. Const. art. 9, § 1, as amended November 3, 1970, specifically gives the legislature power to limit or define the property of a purely public charity to be exempted from tax. See, L. 1969, c. 925."

The factors that make it desirable for the legislature to define and thereby determine North Star's status are not only complex but innumerable. A few of them should be mentioned as they are

the bases for our having exercised judical restraint with the hope that the legislature would indicate its preference by action.

I would start with a short statement about the genesis of North Star and the reason for its creation. While we might accept this history at face value, the legislature might desire to question it in the arena of legislative hearings. In the first North Star case, we summarized this history:

"North Star's genesis is found in a joint study conducted by Upper Midwest Research and Development Council (Upper Midwest) and the University of Minnesota. Upper Midwest was a nonprofit corporation organized to promote the economy of the area comprising the Ninth Federal Reserve District. The joint study was funded by a $350,000 grant from the Ford Foundation and by matching contributions of $220,000 raised by Upper Midwest and the University. The purpose of the study was 'to help finance and develop a continuing economic study of the upper Midwest region.' Pursuant to that goal, the study fostered a proposal for the organization of a research institute. While there are approximately a dozen nonprofit research centers located around the country, none previously existed in the area comprising the Ninth Federal Reserve District.[1] In June 1962, Upper Midwest resolved 'jointly with the * * * University of Minnesota [to] take steps to incorporate * * * a research institute to be located in the Twin Cities metropolitan area.'

"The plans involving the research center came to the attention of certain officers of Minneapolis Area Development Corpora-

---

"[1] There are three large research centers: Battelle Memorial Institute in Columbus, Ohio; Stanford Research Institute in Menlo Park, California; and Illinois Technology Research Institute, Chicago, Illinois. Smaller ones include Southwest Research Institute, San Antonio, Texas; Midwest Research Institute, Kansas City Missouri; Southern Research Institute, Birmingham, Alabama; Research Triangle Institute, Durham, North Carolina; Franklin Institute, Philadelphia, Pennsylvania; Spindletop Research Inc., Lexington, Kentucky; and Gulf South Research Institute, Baton Rouge Louisiana. The last two are substantially supported by their respective states.

tion (MADC) in 1962. MADC, a profitmaking corporation, had been organized for the purpose of stimulating the economy by bringing new business in to the area.[2] In 1956, pursuant to that goal, it had acquired from various landholders an industrial site in Scott County along the Minnesota River. In 1962, the site, known as Valley Industrial Park, contained approximately 2,100 acres having a cost basis of $710,063.15. By 1962, the fair market value of the industrial site was estimated by experienced appraisers to be over $5,000,000. This valuation was, however, subject to a discount to $3,534,250 if the land were to be sold to a single developer—even then, a gain in value of nearly 500 percent before taxes.

"The officers of MADC believed that the proposed research center served their objective of bringing new industry into the area. The president of MADC wrote a letter to MADC shareholders wherein he proposed that they donate the industrial site, their shares and debentures of MADC, and 75 percent of their tax savings to the research institute. The proposal, subsequently reduced to an agreement, provided that all shareholders except the Chicago & North Western Railway Company donate all of their stock and debentures. The railway, the largest MADC shareholder, received no tax benefit from the donation due to its lack of taxable income, but nonetheless it contributed 8,312 shares and sold its remaining 1,288 shares and its MADC debentures for approximately $300,000. This made the railroad North Star's largest contributor. The contributors also agreed to pledge at least $700,000 in cash to support the initiation of the research center. Additionally, certain financial institutions made low-interest loans to the institute. Finally, several companies which were not MADC shareholders contributed cash to the research center. MADC then dissolved."

---

"[2] The *impetus* for MADC was the refusal of a major corporation to move to the Twin Cities area because of the lack of a large site for a plant." 294 Minn. 58, 200 N. W. 2d 412.

As we pointed out in North Star, there are approximately a dozen research centers in the United States. We were then advised that two of them were substantially supported by state funds. We do not know how many of them were promoted and fostered by tax advantages. We do know that Battelle Memorial Institute apparently was not. Should the legislature, in order to promote this economic development of this state, give financial aid by a tax advantage to North Star? The policy of this state is indicated in part at least by Minn. St. 362.12, subd. 1(6), which provides that the Department of Economic Development shall conduct or encourage research designed among other things to develop new products and industrial processes.[1] The University of Minnesota has engaged in applied research in the fields of agriculture and mining, apparently thereby favoring research that will promote the economic wellbeing of the area. The taconite process developed by research at the University of Minnesota is perhaps the most shining example. That process probably was offered to any who would use it, while if developed by North Star the process would be confidential and given only to the person or corporate entity requesting and paying for the research. Where the process or product results from an idea for research and the research is paid for by the entrepreneur who furnishes the idea, it isn't very realistic to assume that the research should be other than confidential. Without any payment for its services, North Star could not survive without substantial aid from the state. Thus, one pertinent question to be answered by the legislature would be—should the fact that the entrepreneur or enterprise paying for the research obtains the direct

---

[1] Minn. St. 362.13(9), additionally empowers this department to aid the tourist and resort industry. The legislature has also seen fit to further aid the resort business if devoted to temporary and seasonal residential occupancy for recreational purposes by creating a partial tax advantage. See, Otis Lodge, Inc. v. Commr. of Taxation, 295 Minn. 80, 206 N. W. 2d 3 (1972). Thus, the encouragement of certain commercial enterprises by the creation of tax advantages would not be innovative as far as legislative policy is concerned.

benefits of that research because of its confidentiality prevent an otherwise purely public charity from being that? It should be noted that in only 10 instances patents were applied for and in the overall affairs of North Star these items could be said to be de minimis. (Moreover, as knowledgable people are aware, many patents turn out to be invalid after protracted litigation.) Thus, it would seem that the confidential nature of the research will in many instances be dissipated as soon as the product is marketed or the services are sold.

Our majority opinion in large measure is based on the reasoning in the Battelle Institute case. While I agree that reasoning is persuasive, I must admit that the answers to the issue at hand are not as one-sided as the Battelle case could lead one to believe. We should not forget that without commercial enterprises there would be little charity of any kind. First of all, we should not assume that all applied research insures a profit, let alone an immediate profit. However, it is a reasonable assumption that in many instances applied research supplied by an institute such as North Star will result in a profit. When that happens, the government then becomes a partner in those profits through taxation and the corporation that risked its capital to acquire a process or product finds itself paying Federal and state income taxes, if it is a business of any consequence, of over 50 percent of its profits. If the owner-stockholders realize any return on their investment, then the government gets an additional share in the returns from the efforts of the research institute and the investment by industry. These taxes are used in large measure for welfare purposes and it is safe to say that today the government is the source of most social welfare. To the extent that applied research results in creating jobs and reducing unemployment, the need for charity by the government is reduced even as more taxes are generated from the pay of our work force. Should research institutes such as Battelle and North Star be given tax-exempt status because of the end result of their research

or should tax-exempt status be withheld because businesses with risk capital may make a profit? How should courts equate this type of decision with one which would give a tax-exempt status to an entity engaged in fostering the performing arts or other cultural objectives? I suspect that if, in an appropriate case, a "nonprofit corporation" in the statutory meaning of that phrase were to engage in a business with the avowed purpose of creating jobs for minorities or the handicapped, we might conclude that such an entity would have a tax-exempt status solely because jobs were provided for the disadvantaged. Applied research, at least when successful, would provide employment although not just for the disadvantaged. Should this make that much difference?

It perhaps would be conceded that applied research will provide a better quality of living overall because of better products and services, less unemployment, and a greater financial ability on the part of the government to improve its welfare programs.

The main reason for deciding that a research institute such as North Star should not be defined as a public charity is that in the first instance the benefits that may accrue from the research go to the profit-making entity that pays for that research. Undoubtedly, if that research were made available to the public, we would not hesitate to declare North Star to be a public charity. I agree that this distinction is sufficient to sustain our decision, but would also agree that the line thus drawn could conceivably be drawn differently by the legislature. We should not forget that it is the research institute alone and not some of its customers that is to be or not to be a public charity. Legislative policy might dictate that the work of such an institute is of such benefit to this state that its performance should be extended or improved by a tax-exempt status.

If we compare the present case with the so-called Guthrie case,[2] we can perhaps more clearly see that any definition of

[2] City of Minneapolis v. Commr. of Taxation, Minnesota Theatre Company Foundation, T. B. Walker Foundation, Incorporated, Tyrone Guthrie Theatre Foundation, and Walker Art Center, Intervenors, a

"purely public charity" now devised is inadequate and the ultimate decision is based on a philosophical view rather than any real legal reasoning.

In Guthrie, the issue presented was whether the Tyrone Guthrie Theatre Foundation and the Minnesota Theatre Company Foundation were purely public charities—thereby exempting their properties from taxation. In Guthrie, as in the instant case, it was conceded that the entities involved were nonprofit and the only substantial issue was whether or not their activities were such as to bring them within the scope of a purely public charity. There were some educational aspects involved in their activities, but in the main and perhaps by way of oversimplification, these entities were operating a classical repertory theater. As such, it unquestionably became a cultural resource of this state. The majority opinion commented on this aspect as follows:

"The charitable objectives of all of the Intervenors can be conveniently summarized as the promotion of the public good by providing the community at large with the benefits of a valuable cultural resource without purpose of private profit. The presence of the Theatre and the imaginative use of its facilities have injected new vitality into the cultural life of our region and in so doing, have stimulated the minds and enriched the spirits of hundreds of thousands of our citizens.

"The value of the Theatre as a cultural resource is indicated by the direct uses to which it has been put during the first two seasons of its existence, by the way in which its policy of integrating its activities with other cultural resources of the community has already augmented, supplemented, and enhanced the programs of these other institutions by the ferment of new ideas that it has excited and by the admiration and regard it has been accorded locally, nationally and internationally. This is charity in the broad sense."

Minnesota Tax Court case decided June 23, 1966 (Docket Nos. 1205, 1206, 1207).

In Guthrie the Tax Court decided that these activities were those of a purely public charity. This decision was not appealed to this court. The legislature has not seen fit to change that decision although approximately 10 years have elapsed.

I do not intend by these comments to imply that the Guthrie decision was erroneous. I merely wish to point out that if one were to ask whether furnishing this community with the classical performing arts was of greater benefit to the state than the furnishing of applied research with the resulting improvement of products and employment, and thus generation of taxes, I suspect most people would choose the applied research. Our legal decisions are not based on the same factors that legislators might use in their legislative processes. We might emphasize the history involved to a greater degree. In North Star, the majority opinion correctly points this out. Somehow anything with a commercial aspect doesn't seem to fall into a "public charity" and yet from a benefit-to-mankind approach, some activities with that commercial aspect probably should. At least for the present, any steps in that direction should be taken by the legislature, and this is especially so where a compromise may be called for. As Mr. Chief Justice Burger observed in a dissenting opinion in Twentieth Century Music Corp. v. Aiken, 422 U. S. 151, 170, 95 S. Ct. 2040, 2051, 45 L. ed. 2d 84, 98 (1975):

"* * * In my view, we should bear in mind that '[our] ax, being a rule of law, must cut straight, sharp, and deep; and perhaps this is a situation that calls for the compromise of theory and for the architectural improvisation which only legislation can accomplish.' "

For the reasons stated, I concur in the majority opinion. I sincerely hope, however, that the legislature will give its attention to this matter and determine as a matter of policy, rather than on some finely drawn legal grounds, the tax status of North Star. A number of persons and entities have given their time and substantial assets to secure a research institute to improve the

economic climate in Minnesota and the surrounding states and their efforts should be rewarded by at least having a complete ventilation of the issue at the legislative level.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.