Zimmerman, J.
 

 This appeal is from a decision of the Board of Tax Appeals denying the application of the Battelle Memorial Institute for the exemption of certain of its real property situated bn King avenue and West Seventh avenue, in the city of’ Columbus, from taxatioii for the year 1945, and also denying an application for the remission of taxes and penalty on the same property for the year 1944. Such property is used by the institute directly in carrying on its activities.
 

 The controlling questions for determination on this appeal are whether the property involved was “used
 
 *54
 
 •exclusively for charitable purposes” within the meaning- of Section 5353, General Code, and whether, under the evidence, the decision of the board, that the property was not so used, is “unreasonable or unlawful.” Section 5611-2, General Code.
 

 One Gordon Battelle died testate in 1923. Item 21 cf his will reads in part as follows:
 

 “All of the residue of my estate of every kind, and character I give, devise and bequeath to’ the trustees hereinafter named for the foundation of a ‘Battelle Memorial Institute,’ to be established in such manner as said trustees may designate in accord with the laws of the state of Ohio, and located in pr near the city of Columbus, Ohio, for the purpose of education in connection with the encouragement of creative and research work and the making- of discoveries and inventions in connection with the metallurgy of coal, iron, ■steel, zinc and their allied industries. * #
 
 *
 

 “It is my will that said trustees shall select such site, prepare such tablets or memorials, construct such buildings, experimental plants or installations, employ such director, experts and assistants, as they may deem advisable for the proper carrying on of the work •of said ‘Battelle Memorial Institute’ and the discovery of new and advanced metallurgical or other processes and the better education of men for employment in connection with any phase of the work of the coal, iron, steel, zinc and their allied industries.
 

 “It is my will that said board of trustees shall undertake and assist in the discovery of such new experiments and processes and license or dispose of the same in such manner and -upon such terms as may seem advisable for the continuance and advancement of said ‘Battelle. Memorial Institute’ and the purposes for which it was founded, and whenever at the close of any calendar year the income from the business of said
 
 *
 
 Battelle Memorial Institute’ shall result in a profit
 
 *55
 
 of over twenty per cent on the principal of this legacy, that said board of trustees shall distribute in the name of said ‘Battelle Memorial Institute,’ the amount of such earnings to such charitable institutions, needy enterprises or persons and in such manner and amounts as in their judgment will do the greatest good for humanity, with the further provision that if at any time said board of trustees shall be satisfied that said ‘Battelle Memorial Institute’ has been built, equipped and provided with such lands, tablets, memorials, buildings, plants, equipment, experts, employees and funds so as to amply insure the purpose for which it was founded and intended, then and in that event, and so long as said board of trustees shall decide said condition maintains, all of the profits over and above the operating expenses of said ‘Battelle Memorial Institute’ shall be distributed by said board of trustees in the name of said ‘Battelle Memorial Institute’ to worthy charitable objects and enterprises in the sanie manner as hereinbefore indicated. * * *”
 

 The bequest for the establishment of the institute amounted to approximately $1,700,000.
 

 Annie Norton Battelle, mother of Gordon Battelle, died in the year 1925, and by the terms of her will an additional sum of about $2,000,000 was added, for the same purpose, to the above-described bequest of her son.
 

 Battelle Memorial Institute was organized in 1925 as a corporation not for profit. Paragraph 3 of the articles of incorporation provides:
 

 “Said corporation is formed for the purpose of education in connection with, and the encouragement of creative and research work and the making of discoveries and inventions in connection with the metal-, lurgy of coal, iron, steel, zinc and their allied industries, and the discovery of new and advanced metallurgical and other processes, and the better education of
 
 *56
 
 men for employment in connection with any phase of the work of the coal, iron, steel, zinc and their allied industries; and in general to carry out the educational, charitable, and benevolent purposes of the bequest made by said Gordon Battelle as set forth in the twenty-first (21) item of his last will and testament a certified copy of which is attached hereto; and to do all things necessary or proper in connection therewith.”
 

 Subsequently, land was acquired, a building was erected and the institute began to function in 1929. The undertaking flourished. Additions and extensions have been made from time to time and the equipment has been constantly supplemented. Over $2,217,000 has been invested in the project, including the sum of about $900,000 for equipment. Some 750 persons are engaged in carrying on the operations of the institute.
 

 According to the evidence introduced before the Board of Tax Appeals, the institute is devoted to a research and educational program with many ramifications. The funds for operating the institute are derived from the income from the endowment furnished by the Battelles and from amounts received from other agencies for which the institute functions, such as industrial corporations and enterprises and the United States government. The scope of the activities of the institute has become through the years broader and more varied than was originally contemplated by Gordon Battelle.
 

 One of the research projects of the institute pertained to the discovery of the most suitable metals for a variety of purposes and to the improvement of the performance of metals in a number of their uses, particularly in resistance to heat.
 

 Some 200 technical reports are prepared every month and are distributed to those interested. These reports have to do with progress made in connection with the projects being carried on. The expense of
 
 *57
 
 preparation and distribution is borne by those financing the particular investigations.
 

 From time to time the scientists and experts working at the institute publish complete histories — reviews of the different activities being pursued — as a matter of information, which go to scientific societies and other groups. This service is financed through income derived from the endowment funds.
 

 Individuals connected with the institute prepare scientific treatises and papers in their specialized fields, which are distributed. Some of these are rewritten in simpler language, understandable by ordinary laymen, and the material so rewritten is widely disseminated.
 

 A co-operative arrangement exists between the institute and The Ohio State University, whereby a certain number of graduate students at the university become “fellows” at Battelle, receiving pay for their services. These individuals spend part of their time in study at the university and part of their time in work at the institute, receiving credit from the university for the time spent at the institute.
 

 There are also “associates” at the institute — men who have finished courses of study at colleges and universities and who are selected by the institute to do experimental work over different periods of time. They are paid a stipend of about $2,000 per year and are given a diploma recognizing their participation in the research program.
 

 Many persons come to Battelle from all over the world for consultation in relation to scientific problems.
 

 During the course of the examination of Clyde E. Williams, director of the Battelle Memorial Institute, he commented:
 

 “Ours is the scientific work. We don’t work out these processes for industry or government, so that industry or government could take our thing and
 
 *58
 
 manufacture it. We get for industry or government the fundamental facts, and then they have to take that knowledge and apply it.”
 

 Although other activities of the institute were emphasized by the witnesses, it developed from the evidence that a great deal of the work performed by the institute constitutes what is denominated as “sponsored research.” For example, an industrial concern or a governmental agency presents a problem which it asks the institute to solve or develop.
 

 Describing the
 
 modus operandi
 
 in situations of this kind, Williams stated:
 

 “Well, we estimate about how many men it-will take and how much supplies and that sort of thing, and we say, well, this job will take an expenditure of $500 a month or six or seven hundred dollars a month for salaries and supplies, and that sort of thing. Then our experience has taught us that if we add on to that 35 per cent as an overhead charge to recompense us for heat and janitor service and some of the administrative people and the stenographers and all that sort of thing, that we just about break even, and so we agree with them that we will undertake an investigation on a certain subject for a year, we restrict them to a minimum of a year, sometimes to several years, if they will pay so much a month to cover these items, and we list all these items. ’ ’
 

 The institute, in conducting this “sponsored research,” often makes discoveries for the sponsors which are valuable and patentable. Generally, the sponsors procure patents and reap whatever resulting benefits there may be.
 

 In its decision, the board pointed out that, for the years 1925 to 1944, inclusive, the gross income of the institute from the endowment funds amounted to $3,989,320.05, while the income from other sources, “sponsored research,” etc., equalled $8,920,685.60.
 
 *59
 
 During the year 1948, for instance, the total gross income was $2,140,336.83, including $220,953.84 from endowment funds. Costs of operation during that year-amounted to $1,848,001.83, resulting in a net profit, excluding income from endowment, of $71,381.16. Likewise, in the year 1944, the total gross income was $2,728,376.85, including $215,937.41 received from the endowment funds. The operating expense was $2,497,-976.93, resulting in a net profit of $14,462.51, exclusive of the income from endowment.
 

 From the evidence before it, the board found “that the institute in most of its activities is furnishing the results of research work to commercial industries for their private gain, many of which results were patented either in the name of the industry or the institute for the benefit of the industry.”
 

 Also, the following comment was made by the board in its decision:
 

 “The intention of Gordon Battelle, as expressed in his will, was to have the institute serve the type of industries in which he was interested. He apparently expected the institute to work on a profitable basis for he provided how the profits should be applied, and the fact that no one was to benefit by the profits except those receiving salaries and that they should be used for charitable purposes does not, under the authorities hereinabove referred to, entitle the property involved to be exempted from taxation. For the above reasons the board finds that the property in question is not used exclusively for charitable purposes.”
 

 In determining whether the decision of the board is unreasonable or unlawful, certain well established rules must be considered and applied.
 

 It was remarked in the case of
 
 Crown Hill Cemetery Assn.
 
 v.
 
 Evatt, Tax Commr.,
 
 143 Ohio St., 399, 403, 55 N. E. (2d), 660, 662, that “* *
 
 *
 
 taxation is the rule and exemption the exception. Therefore, property
 
 *60
 
 which is claimed to be exempt from the payment of taxes must come squarely within exemption provisions, since language which relieves from taxation is to be strictly construed. 38 Ohio Jurisprudence, 852, Section 114;
 
 Cullitan, Pros. Atty.,
 
 v.
 
 Cunningham Sanitarium,
 
 134 Ohio St.; 99, 16 N. E. (2d), 205.”
 

 The above rule obtains where exemption from taxation is claimed, by an institution on the basis that its property is being used for charitable purposes.
 
 Incorporated Trustees of the Gospel Worker Society
 
 v.
 
 Evatt, Tax Commr.,
 
 140 Ohio St., 185, 42 N. E. (2d), 900; 51 American Jurisprudence, 583, Section 600.
 

 Und(*r the controlling statute, Section 5353, General Code, it is incumbent upon an institution claiming exemption to show that the property is being used
 
 exclusively
 
 for charitable purposes.
 
 In re Complaint of Taxpayers,
 
 138 Ohio St., 287, 34 N. E. (2d), 748.
 

 The narrowest possible construction was placed upon the meaning of the term “exclusively” in the Ohio Constitution (Section 2, Article XII) and in the statute enacted pursuant thereto.
 
 Jones, Treas.,
 
 v.
 
 Conn et al., Trustees,
 
 116 Ohio St., 1, 10, 155 N. E., 791, 793.
 

 There can be little doubt that the institute’s real property, which it seeks to have exempted from taxation, is being devoted in part to activities which may properly be denoted as “charitable.” Generally, the dissemination of knowledge for the edification and improvement of mankind is regarded as a charitable object. However, under the will of Gordon Battelle, providing for the institute, he plainly stated that it should be conducted in furtherance of the interests and to serve the ends of designated industries, which certainly would not constitute a charitable purpose. In practice, the institute is being operated in large measure as a business for the benefit and financial advantage of commercial enterprises. The “sponsored research” is financed by these commercial enterprises
 
 *61
 
 and they are the direct beneficiaries of what is produced by the institute for them. Therefore, the real property in issue cannot fairly be said to be used
 
 exclusively
 
 for charitable purposes within the contemplation of the statute.
 

 Of course, it is the use of the property and not the use of the proceeds derived therefrom, which is the test of exemption or nonexemption from taxation under the statute.
 
 Benjamin Rose Institute
 
 v.
 
 Myers, Treas.,
 
 92 Ohio St., 252, 110 N. E., 924, L. R. A. 1916D, 1170;
 
 American Sunday-School Union
 
 v.
 
 Taylor, Tax Recr.,
 
 161 Pa., 307, 29 A., 26, 23 L. R. A., 695.
 

 Where the use of property is wholly for the promotion and advancement of learning, science and the useful arts generally, that use is deemed charitable; but where the use is essentially for the private and pecuniary advantage of a class, such as industrial organizations, the contrary is true.
 

 The institute places reliance on the case of
 
 O’Brien, Treas.,
 
 v.
 
 Physicians Hospital Assn.,
 
 96 Ohio St., 1, 116 N. E., 975, L. R. A. 1917F, 741, where it was held that a public charitable hospital did not lose its charitable status because it received remuneration from patients able to pay for their accommodations. Howeyer, in that case the points were stressed that the
 
 primary object
 
 of the hospital was to render charity to those unable to pay, and that the amounts received from'' a number of pay patients were 'devoted to the primary and humanitarian object for which the hospital was established. See 51 American Jurisprudence, 585, Section 602
 
 et seq.
 

 Applying the principles announced' by this court in the cases above cited and in the cases of
 
 Wehrle Foundation
 
 v.
 
 Evatt, Tax Commr.,
 
 141 Ohio St., 467, 49 N. E. (2d), 52, and
 
 Welfare Federation of Cleveland
 
 v.
 
 Glander, Tax Commr.,
 
 146 Ohio St., 146, 64 N. E. (2d), 813, to the facts of this case, a majority of the court is
 
 *62
 
 of the view that the conclusions reached by the Board of Tax Appeals and set forth in its decision are tenable, and that such decision is neither unreasonable nor unlawful. The decision is, therefore, affirmed. -
 

 Decision affirmed.
 

 Weygandt, C. J., Turner, Matthias and Sohngen, JJ., concur.
 

 Hart and Stewart, JJ., dissent.