AMERICAN CHEMICAL SOCIETY, APPELLANT, *v.*
KINNEY, COMMR., APPELLEE.

[Cite as American Chemical Soc. v. Kinney (1982),
69 Ohio St. 2d 167.]

(No. 81-321—Decided February 10, 1982.)

168

*Messrs. Bricker & Eckler, Mr. William R. Chadeayne, Mr. Jerry E. Nathan* and *Mr. Michael K. Gire,* for appellant.

*Mr. William J. Brown,* attorney general, and *Mr. Charles M. Steines,* for appellee.

KRUPANSKY, J. The primary issue is whether the decision of the BTA is reasonable and lawful. In deciding this issue we must determine, are the parcels in question (approximately 30 acres of land) owned by appellant being used "in furtherance of or incidental to" the charter provisions, viz., its charitable purposes within the purview of R. C. 5709.12 and 5709.121.

R. C. 5709.12 provides, in pertinent part:

" * * * Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation. * * * "

In 1969 the General Assembly adopted R. C. 5709.121 to clarify the phrase "used exclusively for charitable purposes" found in R. C. 5709.12. R. C. 5709.121 provides in relevant part:

"Real property and tangible personal property belonging to a charitable or educational institution * * * shall be con-

sidered as used exclusively for charitable or public purposes by such institution * * * if it is either:

"(A) * * *

"(B) Otherwise made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable, educational or public purposes and not with a view to profit."

In 1976 this court, in *Cincinnati Nature Center* v. *Bd. of Tax Appeals,* 48 Ohio St. 2d 122, established a three-pronged test to determine when a taxpayer could be said to come within the purview of R. C. 5709.121. In that case, at page 125, we stated:

"To fall within the terms of R. C. 5709.121, property must (1) be under the direction or control of a charitable institution or * * * political subdivision, (2) be otherwise made available 'for use in furtherance of or incidental to' the institution's 'charitable * * * or public purposes,' and (3) not be made available with a view to profit."

A review of Section 2 of ACS's national charter reveals that ACS is clearly a charitable or public institution for R. C. 5709.121 purposes. It is also unquestioned the land at issue is "under the direction or control" of ACS. Thus, the first prong of the *Cincinnati Nature Center* inquiry has been satisfied.

A survey of the evidence submitted in the present action indicates the third prong of this test can be also quickly resolved since no evidence was presented to indicate this property is "made available with a view to profit." To the contrary, these parcels of land are maintained primarily for the use of the employees of Chemical Abstracts and occasionally for other public groups who are granted access to the Chemical Abstracts' grounds.

According to the BTA's decision, the real problem arises concerning the second requirement of the *Cincinnati Nature Center* test, which demands the property be made available "for use in furtherance of or incidental to the institution's charitable or public purposes." Appellee commissioner contends the land in question is used solely to create a "pleasant environmental setting" for Chemical Abstracts' employees, a use which in no way furthers its stated purpose of publishing chemical abstracts and indexes. The appellee has failed,

however, to take into account the integral part the entire Chemical Abstracts complex plays in the operation's success.

As previously stated, Chemical Abstracts' function is to collect, abstract and disseminate highly complicated and technical chemical information. In order to fulfill this goal the institution must employ highly qualified individuals who are much sought after by other educational institutions and businesses. Consequently, the inducement must be great to entice these people into employment at Chemical Abstracts. Appellant contends the attractive campus-like setting of its institution is of considerable importance in attracting and retaining these individuals, and thus, has an important effect on the success of its operations. As the Director of Business Operations for Chemical Abstracts stated in his testimony before the board:

"In general, we have felt that an attractive campus-like site has helped us to recruit good people, and also retain good people. In general, we have felt that attractive surroundings are a positive effect with employees."

In order to substantiate these assertions, appellant submitted into evidence the results of a study undertaken to determine the effect of Chemical Abstracts' campus-like setting on its employees. The study concluded the beautified and preserved property in question had a significant impact upon the recruitment, retention and productivity of Chemical Abstracts' staff. The board acknowledged its acceptance of this determination stating, " * * * despite the conflicting interpretations given the study the board finds that the survey does bear out a significant impact upon the Chemical Abstracts Society [sic] staff."

Notwithstanding its recognition of the importance of the property surrounding Chemical Abstracts to the institution's employee relations, the board denied appellant's request for a tax exemption. In reaching this decision we feel the board ignored the integral connection which has been shown to exist between appellant's use of the land in question and appellant's purpose for existence. As stated earlier, the appellant must be able to attract and retain quality personnel to maintain its enterprise. In essence the "equipment" required for Chemical Abstracts to fulfill its charitable purpose is highly qualified

university trained personnel. Since the landscaped property surrounding Chemical Abstracts' facilities has been shown to be instrumental in attracting and retaining such individuals, this land is clearly held " 'in furtherance of or incidental to' the institution's 'charitable * * * purposes.' "

This court has had five previous opportunities to examine R. C. 5709.121(B), and the case law in this area further reinforces our conclusion that this property is being used in a manner which is "in furtherance of or incidental to" Chemical Abstracts' charitable purposes. See *Cincinnati Nature Center* v. *Bd. of Tax Appeals, supra; Galvin* v. *Masonic Toledo Trust* (1973), 34 Ohio St. 2d 157; *White Cross Hospital Assn.* v. *Bd. of Tax Appeals* (1974), 38 Ohio St. 2d 199; *Ohio Masonic Home* v. *Bd. of Tax Appeals* (1977), 52 Ohio St. 2d 127; and *Wellsville* v. *Kinney* (1981), 66 Ohio St. 2d 136. An analysis of these five cases reveals the approach used by this court when determining tax exempt status pursuant to R. C. 5709.121: *e.g.,* first, the purpose of the organization must be defined; and second, the property must be used in furtherance of or incidental to that purpose. Applying these criteria to the instant case it is clear Chemical Abstracts' defined purpose is to collect, abstract and disseminate chemical research; the campus-like use of the land is required to compete with analogous type institutions in the recruitment, retention and productivity of its employees. In·light of this analysis, the BTA should have granted the land in question a tax exempt status.

From our examination of the record before us and the applicable case law, we conclude the decision of the Board of Tax Appeals is unreasonable and unlawful, and it is, therefore, reversed.

*Decision reversed.*

SWEENEY, LOCHER and HOLMES, JJ., concur.

CELEBREZZE, C. J., W. BROWN and C. BROWN, JJ., dissent.

WILLIAM B. BROWN, J., dissenting. In my estimation, the majority opinion licenses charitable institutions to purchase excess acreage, hold it tax free as it appreciates in value, and then sell it for a profit simply because their employees find

grassy fields more pleasing to look at than developed land. Since this result places a grossly unjust burden on the taxpayers of Ohio by requiring them to underwrite the lost revenue without receiving any charitable benefit, I must respectfully dissent.

This court must always remain cognizant of its limited scope of review concerning decisions of the Board of Tax Appeals. The function of this court is limited to a determination from the record whether the decision reached by the board is unreasonable or unlawful. *Citizens Financial Corp.* v. *Porterfield* (1971), 25 Ohio St. 2d 53; *Buckeye Power* v. *Kosydar* (1973), 35 Ohio St. 2d 137. It has repeatedly been held that this court cannot act as a trier of fact *de novo*. *3535 Salem Corp.* v. *Lindley* (1979), 58 Ohio St. 2d 210; *Episcopal Parish* v. *Kinney* (1979), 58 Ohio St. 2d 199; *Alcoa* v. *Kosydar* (1978), 54 Ohio St. 2d 477.

In reversing the board's determination that the 30 acres of vacant land in question did not qualify for tax-exempt status under R. C. 5709.12, the majority has disregarded these well-established principles. A close examination of the record reveals that there was sufficient probative evidence to support the board's determination; hence, its determination was neither unlawful nor unreasonable and should be upheld.

A three-prong test for determining whether property is tax exempt under R. C. 5709.121 was established by this court in *Cincinnati Nature Center* v. *Bd. of Tax Appeals* (1976), 48 Ohio St. 2d 122, 125: " * * * [The] property must (1) be under the direction or control of a charitable institution or state or political subdivision, (2) be otherwise made available 'for use in furtherance of or incidental to' the institution's 'charitable * * * or public purposes,' and (3) not be made available with a view to profit."

Undeniably, the first prong of the test is met, for American Chemical Society (ACS) is, for the purposes of R. C. 5709.121, a charitable or public institution[1] and the land in question is under the direction or control of ACS.[2]

The majority reasoned that the third prong of the test was

---

[1] The American Chemical Society was chartered by the Congress of the United States and its status as a charitable organization is not in dispute in this appeal.

[2] There is no question that the land is under the control of ACS.

also sufficed because no evidence was presented to indicate the property is "made available with a view to profit." Noticeably absent from the majority's discussion is the fact that ACS negotiated with the Ohio College Library Center for the sale of a portion of this land.[3] Testimony was presented that a building was to be constructed on the open area which the majority has held to be tax exempt. While the negotiations for sale were eventually abandoned, the fact that the land was on the real estate market is a strong indication that the land is being held with a view toward profit.

It is true that no income was presently being derived from the land and that there was no commercial use of land. This does not establish conclusively, however, that the land was not being held with a view toward profit. The term "profit" is certainly broad enough to encompass a transaction where excess land is acquired and later sold at a higher price. Indeed, it is a common practice for corporations as well as individuals to venture into the real estate market, purchase a tract of land with the expectation it will appreciate in value, and then sell it, thus realizing a substantial return on their initial investment.

Furthermore, it is well established that "[t]he rationale justifying a tax exemption is that there is a present benefit to the general public from the operation of the charitable institution sufficient to justify the loss of tax revenue." *White Cross Hospital Assn.* v. *Bd. of Tax Appeals* (1974), 38 Ohio St. 2d 199, 201. The only benefit from holding this acreage tax exempt flows to ACS, for ACS can hold this essentially vacant land[4] while it appreciates, pay no property taxes thereon, sell it for a profit, and only be liable for the tax upon any realized

---

[3] The following testimony of Mr. Heilman clearly established that the land in question clearly was up for sale:

"Q. Mr. Heilman, you indicated that there is a possibility that a building will be constructed on the open area north of Burnbrae Street, correct?

"A. Yes.

" * * *

"[Q.] Would American Chemical Society own the building?

"A. Legally, no.

"Q. Would they own the underlying land?

"A. No, sir."

[4] This land has remained ostensibly undeveloped. Located thereon are picnic benches, volleyball courts, a softball diamond, and a walking path.

capital gain. There is no conceivable present benefit to the general public, as is required, from holding this land tax exempt. As such, there is no sufficient justification for the loss of tax revenue. For these reasons, it is my opinion that the facts do not support a finding that the third prong of the test has been met.

Contrary to the board's determination, the majority also found that the second prong of the test was established. The majority reasoned that "[s]ince the landscaped property surrounding Chemical Abstracts' facilities has been shown to be instrumental in attracting and retaining * * * [the institution's employees], this land is clearly held ' "in furtherance of or incidental to" the institution's "charitable* * * purposes." ' " This logic is not only unfaithful to the record, but is also contradictory to established case law.

There is ample evidence in the record to demonstrate that while the beautified land may have had a "significant impact" on employee relations, it was not unreasonable nor unlawful for the board to conclude that it was not substantial enough to constitute a " 'use in furtherance of or incidental to' the institution's 'charitable * * * or public purposes.' " Indeed, the following exchange clearly indicates the land was not so used:

"Q. Sir, you have already testified that the business of your company is in the collection, translation, briefing and eventual dissemination of chemical, chemistry related materials.

"Is any portion of the land north of Burnbrae Street on Appellant's Exhibit Number 1 used in that operation?

"A. No, Not directly."

In point of fact, the main use made of the property in question is by Chemical Abstracts' employees for recreational purposes.[5] These employees may engage in sporting events on the open field which constitutes this property or they may simply eat their lunches or stroll along the riverbank. No other use is made of the land by Chemical Abstracts or its employees. It is difficult to perceive how such uses of the land in question further Abstracts' publishing business or is incidental to it.

Furthermore, in order to substantiate their position that

---

[5] See fn. 4, *supra.*

owning and maintaining land in an aesthetically pleasing manner is instrumental in the recruitment, retention and productivity of the institution's employees, the majority relied heavily on a study undertaken by ACS to determine the effect of ACS's campus-like setting on its employees. Close scrutiny of the study, however, indicates that it was neither unlawful nor unreasonable for the board to recognize that the survey results did indicate that the beautified and preserved property had a significant impact on the ACS staff, but nevertheless deny appellant's request for a tax exemption.

For example, ACS contended, and the majority so found, that the survey indicated that the grounds were important in attracting qualified personnel.

What is not mentioned, however, is that of the 16 factors that Abstracts' employees were asked to consider in response to the question, "[t]o what extent did each of the following affect your decision to come to work for * * * [Abstracts]," the natural setting of Abstracts' grounds was considered *less important than all but one other factor.*

In its brief, ACS also noted the following testimony: " ' * * * there is a fair amount of evidence in these summaries that the setting of the building appears important, the exterior landscaping, the park-like setting, having space outside for solitude and privacy and/or recreation. * * * So it would seem this environment of the building would be instrumental from at least, the perceptions of the work force in question.' "

Again, what fails to be mentioned is that of the 11 factors that Abstracts' employees were asked to consider in response to the question, "[p]lease rate each of the factors listed below as to the extent that each contributes to the quality of work life at * * * [Abstracts]," only two factors, mail service and cafeteria, were ranked lower than the vistas surrounding Abstracts' buildings and their exterior landscaping. Factors such as the existence of parking space, a flex-time program, building maintenance, and four other factors all contributed more to the quality of work life at Abstracts.

While it may be conceded that most normal persons appreciate a pleasant and attractive environment to work in, the results of the survey seem to indicate that the natural setting provided by the land in question is not as important to Ab-

stracts' employees as the majority so believes. After all, 15 of the 16 factors Abstracts' employees were asked to consider were more important to them when deciding whether to come to work for Abstracts. Moreover, once employed by Abstracts, the employees ranked the natural setting near the bottom of the list of factors that contribute to their quality of work life.

Even if I could accept the majority's premise, based on the somewhat dubious results of the survey, the fact remains that the use of land for nothing more than a pleasant environmental setting does not constitute a use in furtherance of or incidental to Abstracts' charitable, educational or public purpose. If that were the case, a charitable institution could have a championship golf course designed and constructed, paralleling that of Augusta National, and never pay taxes thereon. While a championship golf course may indeed be instrumental in the recruitment and retention of employees, I, for one, do not believe that such activity is what the General Assembly envisioned when R. C. 5709.121 was enacted.

Moreover, the majority's position is inconsistent with prior case law. Paraphrasing the court's opinion in *Ohio Masonic Home* v. *Bd. of Tax Appeals* (1977), 52 Ohio St. 2d 127, 130, wherein this court denied tax-exempt status to the farmland in question on the basis that the charitable institution's purpose was to maintain a home for the aged and not to farm land: "Abstracts' purpose is not to entertain its employees, but rather to publish chemical abstracts and indexes." The land in question is not used in any fashion whatsoever to assist Abstracts in its publishing activities. Accordingly, the land in question is not entitled to tax exemption pursuant to R. C. 5709.12 and 5709.121.

In denying tax exemption for a medical building connected to a hospital which was rented as office space to staff physicians, this court noted in *White Cross Hospital Assn., supra,* at pages 200-201, that: " 'There is no evidence of any charitable activity being carried on in this building. Admittedly, it is a convenient arrangement and no doubt is beneficial in some respects to the operation of the hospital, but the use of this property is a commercial use and is not within the purview of R. C. 5709.121.' " Application of this rationale to the present case indicates that no evidence exists of any charitable ac-

tivity taking place on this land. It is a convenient arrangement and, as the survey demonstrates, somewhat beneficial to the appellant's operation. The use of this property, however, is nonetheless recreational and, as such, it does not fall within the purview of R. C. 5709.121.

Most telling is this court's most recent decision in *State Teachers Retirement Bd.* v. *Kinney* (1981), 68 Ohio St. 2d 195, 198, wherein it was held, in part, that a parking lot designed to be used only by employees of the retirement board was not " 'in furtherance of or incidental to' " the board's public purposes and thus not exempt from taxation. This court reasoned that "[t]here is no nexus between a parking lot owned by the retirement board and used exclusively for its employees and the public purpose served by the board," for the parking lot was not essential to the function of the public facility.

It is inconceivable to me how this court can, in less than a period of two months, reason that a parking lot used only by employees of the charitable institution *is not* " 'in furtherance of or incidental to' " the retirement board's public purpose and yet reason today that 30 acres of essentially vacant land used primarily for recreational purposes *is* " 'in furtherance of or incidental to' " charitable purpose of ACS. As was discussed above, the vacant land clearly is in no way essential to the function of ACS. There is no nexus between the acreage at issue herein and the charitable purpose of ACS as there was no nexus between the parking lot and the retirement board's public purpose. As such, tax-exempt status for this 30 acres of land should likewise be denied.

For the reasons advanced above, it is my opinion that the board's determination that the vacant land in question was not used exclusively for a charitable purpose was reasonable and lawful, and should thus be upheld.

CELEBREZZE, C. J., and C. BROWN, J., concur in the foregoing dissenting opinion.