CASE WESTERN RESERVE UNIVERSITY, APPELLEE AND CROSS-APPELLANT, *v.* TRACY, TAX COMMISSIONER, APPELLEE; CLEVELAND BOARD OF EDUCATION, APPELLANT AND CROSS-APPELLEE.

[Cite as *Case W. Res. Univ. v. Tracy* (1999), 84 Ohio St.3d 316.]

(No. 97–2118—Submitted May 20, 1998—Decided January 20, 1999.)

318

*Kelly, McCann & Livingstone, L.L.P., Fred J. Livingstone* and *Robert A. Brindza,* for appellee and cross-appellant Case Western Reserve University.

*Armstrong, Mitchell, Damiani & Zaccagnini, Timothy J. Armstrong* and *Maura Norton,* for appellant and cross-appellee Cleveland Board of Education.

---

**Per Curiam.** In its application for exemption, CWRU claimed that the University West Building and its attached parking garage should be exempted from real property taxation under R.C. 5709.12 and 5709.121. R.C. 5709.12(B), provides:

"Real * * * property belonging to institutions that is used exclusively for charitable purposes, shall be exempt from taxation."

Thus, under R.C. 5709.12, property belonging to an institution and used exclusively for charitable purposes is exempt from taxation. No challenge has been raised here as to CWRU's status as an institution within the meaning of R.C. 5709.12. Likewise, no challenge has been made to the exempt status of CWRU's own use of the space within the University West Building. However, by its appeal, the BOE challenges the exempt status granted by the BTA to the vacant space and the space which CWRU rents to EDI and EBTC. The BOE contends that space rented by EDI and EBTC is not being used exclusively for charitable purposes. The BOE contends that neither EDI nor EBTC is a charitable or educational institution.

In 1969, the General Assembly enacted R.C. 5709.121 to clarify the phrase "used exclusively for charitable purposes" as used in R.C. 5709.12. As in effect on January 1, 1993, R.C. 5709.121 provided:

"Real property * * * belonging to a charitable or educational institution * * * shall be considered as used exclusively for charitable * * * purposes by such institution * * * if it is either:

"(A) used by such institution * * *, or by one or more other such institutions * * * under a lease, sublease, or other contractual arrangement:

" * * *

"(2) for other charitable, educational * * * purposes." 133 Ohio Laws, Part III, 2646.

In his concurring opinion in *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 203, 67 O.O.2d 224, 226, 311 N.E.2d 862, 865, Justice Stern stated that the overall purpose of R.C. 5709.121 was to "declare that the ownership and use of property need not coincide for that property to be tax exempt."

In the context of this case, R.C. 5709.121(A)(2) requires that (1) the property must belong to a charitable or educational institution, (2) the property must be used by the institution, or by one or more such institutions under a lease, sublease, or other contractual arrangement, and (3) the institution or other institutions must be using the property for charitable or educational or public purposes. EDI and EBTC meet the first two conditions; the third condition is disputed.

In *Planned Parenthood Assn. of Columbus, Ohio, Inc. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, we held in paragraph one of the syllabus that " 'charity,' in the legal sense, is the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." In *Herb Soc. of Am., Inc. v. Tracy* (1994), 71 Ohio St.3d 374, 376, 643 N.E.2d 1132, 1134, we stated, "The dissemination of useful information to benefit mankind is, traditionally, charity." Likewise, In *Battelle Mem. Inst. v. Dunn* (1947), 148 Ohio St. 53, 60, 35 O.O. 9, 12, 73 N.E.2d 88, 92, we stated, "Generally, the dissemination of knowledge for the edification and improvement of mankind is regarded as a charitable object."

Both EDI and EBTC receive funding from the state of Ohio through the Department of Development's Thomas Alva Edison Grant Program ("Edison Program"). The purpose of the Edison Program, as set forth in R.C. 122.33(C), is "to provide grants to foster cooperative research and development efforts involving enterprises and educational institutions that will lead to the creation of jobs." The grants may be "made to a public or private educational institution, department, college, institute, faculty member, or other administrative subdivision or related entity of an educational institution when the director finds that the undertaking will benefit the people of the state by supporting research in advanced technology areas likely to improve the economic welfare of the people of the state through promoting the development of new commercial technology." R.C. 122.33(C)(1).

It is abundantly clear from the testimony and evidence in this case that the goal of both EDI and EBTC is to promote and develop emerging technologies and emerging companies in order to provide jobs for people and to strengthen the economy of the state, especially in northeastern Ohio. Both EDI and EBTC provide unique resources for entrepreneurs by providing information, knowledge, and, in the case of EBTC, sometimes even money, to aid in developing advanced technological concepts and the organizations developing these technologies. The state has chosen to help support EDI and EBTC as one of the means to

encourage the development of technology in Ohio in order to promote economic growth. The fact that EDI and EBTC may require that some of their aid be returned at a later time to help others is of no consequence. See *Planned Parenthood, supra,* paragraph three of the syllabus.

We find the BTA's determination that EDI's and EBTC's use of the property falls "within the gambit [*sic*] of charitable, educational and/or public purposes" as set forth in R.C. 5709.121(A) to be supported by the evidence and to be reasonable and lawful. However, we limit our decision as regards EDI to the administrative area occupied by it. We do not include within the exempt area the space occupied by EDI's Incubator Program tenants, all of which are for-profit corporations. While the companies in the Incubator Program may be struggling, and may even be in a negative equity position, they are, nevertheless, for-profit corporations that are themselves subtenants of CWRU. We do not interpret R.C. 5709.121 to include within the meaning of "used exclusively for charitable purposes" real property contractually occupied by for-profit corporations whose activities are not shown to be charitable, educational, or for a public purpose. We are unable to discern any charitable, educational, or public purpose being performed by EDI's for-profit Incubator Program tenants.

We have considered CWRU's argument that because the for-profit corporations occupy their spaces only for a few years, their use is incidental. We disagree with that reasoning. It is quite apparent from the testimony that although the time each Incubator Program tenant spends in the University West Building may be relatively short, the plan is for each tenant to be replaced by another for-profit tenant. Thus, the Incubator Program space is continuously being occupied by for-profit corporations. The time each for-profit company occupies the space is irrelevant. The important concept is that the Incubator Program tenants are using the space in the University West Building, and their use as regards exemption must be compared to R.C. 5709.121, the same as EDI and EBTC. A review of the evidence in this case does not disclose any support for a finding that the area occupied by the for-profit Incubator Program tenants is for a charitable, educational, or public purpose.

The BOE's second contention is that the vacant space in the University West Building should not be exempted under R.C. 5709.12 and 5709.121. We agree.

This court has granted exemption in the past to vacant property. For instance, in *Holy Trinity Protestant Episcopal Church v. Bowers* (1961), 172 Ohio St. 103, 15 O.O.2d 173, 173 N.E.2d 682, we held that under R.C. 5709.07 vacant property purchased by a religious institution could be exempted, where there is tangible evidence that the property will be devoted to an exempt use. In this case, we are faced with a different situation. When asked when plans for expansion were formed the witness from EDI responded: "Probably '94, late '94." Thus, as of

January 1, 1993, which is the critical date for a 1993 tax year exemption, there were no plans for expansion. In addition, the testimony concerning expansion into the vacant areas was not clear as to how much space would be occupied by such expansion.

Finally the cross-appeal filed by CWRU contends that the garage should be exempted. We disagree.

In support of its contention, CWRU relies on *Bowers v. Akron City Hosp.* (1968), 16 Ohio St.2d 94, 45 O.O.2d 445, 243 N.E.2d 95, and *Good Samaritan Hosp. v. Porterfield* (1972), 29 Ohio St.2d 25, 58 O.O.2d 75, 278 N.E.2d 26. In *Bowers*, we granted tax exemption for a pay parking lot used by hospital visitors and patients. In *Good Samaritan Hosp.*, we granted exemption from sales tax for building materials used in the construction of a parking garage attached to a hospital.

In opposition to CWRU's contention, the BOE cites *State Teachers Retirement Bd. v. Kinney* (1981), 68 Ohio St.2d 195, 22 O.O.3d 434, 429 N.E.2d 1069. In *State Teachers*, we denied real property tax exemption for a remote parking lot used by employees of the State Teachers Retirement Board.

The BTA found that the University West Building parking garage is not generally open to the public; instead, its use is limited to CWRU employees and tenants of the University West Building. The BTA's finding that the parking garage is not generally open to the public is supported by the testimony of the assistant treasurer of CWRU, who testified that the primary need for the garage is to provide parking for occupants of the building. In addition, a letter to the assistant treasurer states that the university lots are not public.

In *Bowers* we granted exemption, finding that the evidence showed that "the parking lot is an essential and integral part of the hospital's function." *Id.,* 16 Ohio St.2d at 96, 45 O.O.2d at 447, 243 N.E.2d at 97. In *Good Samaritan* we again found that the evidence showed that the parking lot was an "essential and integral part of the hospital's function." *Id.* at 29, 58 O.O.2d at 78, 278 N.E.2d at 29.

The test for exemption for the University West Building parking garage is whether it is an essential and integral part of the charitable and/or educational activities of CWRU, EDI, and EBTC. However, in this case the BTA made no finding that the parking garage was an essential and integral part of the charitable and/or educational activities of the tenants of the University West Building. The BTA could not make a finding on the usage of the garage because "appellant failed to provide this Board with either a breakdown of the usage of the garage as of January 1, 1993 or a means by which we could accurately project such usage as of that date." The burden was on CWRU to present evidence to

support its claim for exemption. In *Alcan Aluminum Corp. v. Limbach* (1989), 42 Ohio St.3d 121, 123, 537 N.E.2d 1302, 1304, we stated:

"[I]t is error for the BTA to reverse the commissioner's determination when no competent and probative evidence is presented to show that the commissioner's determination is factually incorrect."

For all the foregoing reasons the decision of the BTA granting exemption for the space occupied by EDI and EBTC for their administrative offices is reasonable and lawful and is affirmed. In addition, the BTA's decision denying exemption for the garage and the land associated therewith is reasonable and lawful and is affirmed. The decision of the BTA granting exemption to the vacant areas of the University West Building and the areas occupied by EDI's for-profit Incubator Program tenants is unreasonable and unlawful and is reversed.

*Decision affirmed in part*
*and reversed in part.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

PFEIFER, J., dissents and would affirm the Board of Tax Appeals in all respects.

---

LUNDBERG STRATTON, **J., concurring in part and dissenting in part.** I agree with the majority's holding with two exceptions. I believe that the parking garage and the below-market-cost office space made available to start-up technology-based companies should be exempt from taxation.

### Office Space Provided by the Incubator Program

The majority reverses the BTA's decision to exempt the office space. The majority reasons that the *incubator tenants* do not use the office space for a charitable purpose and therefore the office space is not tax-exempt. I believe a more reasonable interpretation of R.C. 5709.121(A) requires examination of EDI's use of the office space to determine whether it should be exempt from taxation.

A statute is presumed to intend a just and reasonable result. R.C. 1.47(C). Thus, courts should construe a statute to avoid an unreasonable result. *Canton v. Imperial Bowling Lanes, Inc.* (1968), 16 Ohio St.2d 47, 45 O.O.2d 327, 242 N.E.2d 566, paragraph four of the syllabus. Former R.C. 5709.121 stated:

"Real property * * * belonging to a charitable or educational institution * * * shall be considered as used exclusively for charitable * * * purposes * * * if it is either:

"(A) Used by such institution * * *, or by one or more other such institutions * * *:

" * * * *

"(2) For other charitable, educational, or public purposes." 133 Ohio Laws, Part III, 2646.

The majority examines the incubator *tenants'* use of the office space to determine whether an exemption applies. Instead, I would find that former R.C. 5709.121(A) requires examination of *EDI's* use of the office space. EDI uses the office space to implement the facilities portion of the Incubator Program by offering below-market-cost office space to start-up technology-based companies. Thus, the incubator tenants' occupation and use of the office space are merely a consequence of EDI's use. In other words, it is EDI's use of the office space that is relevant to whether an exemption applies, not the tenant's use. Accordingly, I would examine EDI's use of office space by making it available to start-up technology-based companies to determine whether that use is for a charitable purpose.

EDI is a division of Weatherhead School of Management, which is part of CWRU. EDI's mission is to encourage, support, and recognize entrepreneurial achievement in northeast Ohio. EDI is partially funded by state funds from the Thomas Alva Edison program, established by R.C. 122.33(C). Nonstate support is provided by foundation funding, grants and contracts from the federal government, memberships, and contract services from industrial sources, as well as rent and service fees from incubator tenants. EDI developed and administers the Incubator Program, supported by the same mixture of funds.

The purpose of EDI's Incubator Program is to further develop and better establish start-up technology-based companies ultimately to create job opportunities.[1] In support of this goal, the Incubator Program offers services primarily in three major categories: office and laboratory space; business assistance; and business training and education. The Incubator Program provides numerous services to assist these companies, including managerial assistance, technical assistance, office services and facilities, financial assistance, marketing assistance, public relations assistance, and entrepreneurial education.

The Incubator Program provides the sophisticated laboratory and office space needed by start-up technology companies at below market cost. In the Cleveland

---

1. EDI defined start-up companies as those less than two years old, or companies that have recently undergone a management change, or high technology companies up to ten years old that have not yet brought products to market. Typically, start-up companies have an eighty percent failure rate within five years of their inception. Technology-based start-up companies are even more frail than other start-up companies. But with the assistance of incubator programs, these figures are reversed, with eighty percent of the start-up companies still in business after five years.

area, this space is either unavailable or very expensive environments. Without such space for these companies, it is likely that they would fail or locate in another, more business-friendly environment. Thus, availability of the discount rental space is a crucial aspect of the Incubator Program to enable start-up technology-based companies to become viable and to locate in the Cleveland area.

Thus, providing office space in this context is for charitable, educational, or public purpose because, consistent with the majority's finding that the remainder of EDI's Incubator Program serves a charitable purpose, it also serves to "promote and develop emerging technologies and emerging companies in order to provide jobs for people and to strengthen the economy of the state."

Therefore, I would find that EDI's use of the office space by offering it to start-up technology companies at below market cost is a charitable purpose within the context of R.C. 5709.121(A). Accordingly, I would affirm the BTA's determination that the office space was exempt from taxation as being reasonable and lawful.

### CWRU's Garage

The majority also affirms the BTA's determination that the CWRU parking garage is not exempt from taxation. In denying the exemption for the parking garage, the BTA cited *State Teachers Retirement Bd. v. Kinney* (1981), 68 Ohio St.2d 195, 22 O.O.3d 434, 429 N.E.2d 1069, in determining that because the CWRU parking garage was not open to the public, it could not be exempted under former R.C. 5709.121. The BTA also found that there was "insufficient information * * * to accurately split-list the facility in order to account for exempt and non-exempt use." I disagree with both conclusions.

In *Cincinnati Nature Ctr. Assn. v. Bd. of Tax Appeals* (1976), 48 Ohio St.2d 122, 2 O.O.3d 275, 357 N.E.2d 381, this court set out a three-prong test to determine whether property is exempt from taxation under R.C. 5709.121(B). In order for the property to be exempt, it must "(1) be under the direction or control of a charitable institution or state or political subdivision, (2) be otherwise made available 'for use in furtherance of or incidental to' the institution's 'charitable * * * or public purposes,' and (3) not be made available with a view to profit." *Id.* at 125, 2 O.O.3d at 277, 357 N.E.2d at 383.

In *State Teachers Retirement Bd.*, the court, construing R.C. 5709.121(B), stated that "a new parking lot owned by the State Teachers Retirement Board restricted to exclusive use by its employees is not 'in furtherance of or incidental to its * * * *public purposes.*'" (Emphasis *sic.*) 68 Ohio St.2d at 198, 22 O.O.3d at 436, 429 N.E.2d at 1071. The court reasoned, "There is no nexus between a parking lot owned by the retirement board and used exclusively for its employees

and the public purpose served by the board." 68 Ohio St.2d at 198, 22 O.O.3d at 436, 429 N.E.2d at 1072.

I disagree with this interpretation of R.C. 5709.121(B). I would find that exclusive use of a charitable institution's parking facility by its employees does not necessarily preclude a finding that such use is in furtherance of or incidental to the institution's charitable purpose.[2]

A better-reasoned analysis is made in *Am. Chem. Soc. v. Kinney* (1982), 69 Ohio St.2d 167, 23 O.O.3d 197, 431 N.E.2d 1007. In *Am. Chem. Soc.*, decided after *State Teachers Retirement Bd.*, the American Chemical Society ("ACS") sought a tax exemption pursuant to R.C. 5709.121(B) for landscaped property which surrounded ACS's office building. In support of its contention, ACS submitted a study undertaken to determine the effect of the "campus-like" setting on its employees. The study concluded that the beautification promoted the recruitment, retention, and productivity of the staff. Applying the test set out in *Cincinnati Nature Ctr.*, the court in *Am. Chem. Soc.* held:

"When landscaped and beautified property surrounding a charitable institution is shown to be instrumental in the recruitment, retention and productivity of the institution's employees, and such employees play an integral role in the continued success of the institution, the property is exempt from taxation and falls within the purview of R.C. 5709.121." 69 Ohio St.2d 167, 23 O.O.3d 197, 431 N.E.2d 1007, paragraph two of the syllabus.

The court reasoned,

"Since the landscaped property surrounding Chemical Abstracts' facilities has been shown to be instrumental in attracting and retaining [trained personnel] this land is clearly held ' "in furtherance of or incidental to" the institution's "charitable * * * purposes." ' " *Id.* at 172, 23 O.O.3d at 200, 431 N.E.2d at 1010.

Thus, in contrast to *State Teachers Retirement Bd.*, this court in *Am. Chem. Soc.* determined that property used for the purpose of retaining and aiding its employees was used in furtherance of or was incidental to ACS's charitable purposes. The decision in *State Teachers* is an aberration, and should be overruled. As the BTA has recognized, " '[p]arking is essential and integral to such institutions' charitable missions, for without a means to park vehicles at

---

2. *State Teachers Retirement Bd.* addresses whether a parking lot is used in furtherance of or is incidental to a *public* purpose, while this case involves a determination as to whether the garage property is used in furtherance of or is incidental to a *charitable* purpose. But for purposes of analysis there should be no distinction between a charitable purpose and a public purpose in the context of whether exclusive use of the property by employees of the owner precludes a finding that the property is used in the furtherance of or is incidental to a charitable or public purpose pursuant to R.C. 5709.121(B).

their business locations, said businesses could not operate.'" *Missionary Church, Ohio Dist., Inc. v. Limbach* (Mar. 19, 1993), BTA No. 90–A–504.

Therefore, in the case at bar, I would apply the three-prong test from *Cincinnati.* I would also hold, consistent with the rationale of *Am. Chem. Soc.*, that the exclusion of the public from a charitable institution's property does not necessarily preclude a finding that the property is used in furtherance of or is incidental to a charitable purpose pursuant to R.C. 5709.121(B).

Property is used in furtherance of a charitable purpose where it is shown that the use is *integral* to the institution's charitable function. *Am. Chem. Soc.* at paragraph two of the syllabus; *Bowers v. Akron City Hosp.* (1968), 16 Ohio St.2d 94, 96, 45 O.O.2d 445, 447, 243 N.E.2d 95, 97. Evidence that a parking facility provides a safe and convenient place to park is sufficient to prove that a parking lot is integral to the institution's charitable purpose. *Id.*

In the case at bar, University Circle Incorporated is a nonprofit corporation established by CWRU. Under the direction of CWRU, University Circle Incorporated operated the parking garage attached to the University West Building. University Circle determined parking rates "based on the budgeted costs and income on a break-even basis." Thus, the garage is under the direction of CWRU, a charitable and or educational institution, and the garage is not run for profit. Thus, the first two prongs of the *Cincinnati Nature Ctr.* test are met.

The garage provides parking primarily for occupants of the University West Building. Most of the approximately one hundred and seventy permits issued for the parking garage in 1992 were for EDI, EBTC, or CWRU employees. As determined above and in the majority opinion, EDI and EBTC engage in charitable acts and, presumably, CWRU employees serve an educational purpose.

The garage is needed for these employees because the University West Building sits on the periphery of the campus, so there is little other available parking in the area. Additionally, the area is run-down and subject to urban blight, so the employees feel safer parking in the enclosed garage which directly accesses the University West Building. Finally, although there are public transportation stops nearby, most occupants of the University West Building do not use public transportation because it is inconvenient.

Thus, there is sufficient evidence to indicate that the CWRU parking garage is used in furtherance of or incidental to EDI's, EBTC's, and CWRU's charitable/educational charitable purposes because it is integral to the parking needs for EDI, EBTC, and CWRU employees.

Therefore, I would find that there is sufficient evidence to satisfy the three-prong *Cincinnati Nature Ctr.* test. Accordingly, I would reverse the BTA's

denial of a tax exemption for the parking garage property as being unlawful and unreasonable.

COOK, J., concurs in the foregoing opinion.